ALLIANCE FOR the MENTALLY
ILL, et al., Plaintiffs,

v.

CITY OF NAPERVILLE,
et al., Defendants.

No. 94 C 7559.

United States District Court,
N.D. Illinois,
Eastern Division.

March 29, 1996.

Joanne Kinoy, Jeffrey Lynn Taren, Kinoy, Taren, Geraghty & Potter, Chicago, IL, for plaintiffs.

Ronald S. Cope, Thomas George DiCianni, Ancel, Glink, Diamond, Cope & Bush, Chicago, IL, Michael M. Roth, Howard P. Levine, and Paul L. Stephanides, City of Naperville, Naperville, IL, for City of Naperville.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

The Alliance for the Mentally Ill and other plaintiffs allege that the City of Naperville and other defendants have violated the Fair Housing Amendments Act of 1988. Plaintiffs move for summary judgment. Defendants move for dismissal or summary judgment. For reasons set forth below, the court grants plaintiffs' motion denies defendants' motions.

### Background

This case grew out of a dispute between the Alliance for the Mentally Ill of DuPage County ("Alliance") and the City of Naperville ("Naperville" or "city") over the application of Naperville's fire prevention code to a residential home for mentally ill adults owned by the Alliance.

The Alliance, a plaintiff in this case, seeks to provide housing and services for mentally ill residents of DuPage County. It is a not-for-profit organization run entirely by volunteers, many of whom have adult relatives with mental impairments. (Defs.' 12(M) ¶ 1; Pls.' 12(M), Ex. A, Rose Aff. ¶ 2.)[1] Naperville, a defendant in this case, is a municipal corporation located in DuPage County, Illinois. (Defs.' 12(M), ¶ 2.)

## I. ORIGINS OF THE DISPUTE

Since 1993 the Alliance has sought to establish a residential home for mentally ill adults in Naperville. In July of 1993, Naperville approved a Community Development Block Grant ("Block Grant") of $97,000 to help the Alliance purchase such a home. Under the terms of the Block Grant, the Alli-

---

**1.** Throughout this Memorandum Opinion, the term "12(M)" refers to the statement of material facts submitted by the movant pursuant to Rule 12(M)(3) of the Local Rules of this court. The term "12(N)" refers to a response to the movant's statement submitted by the non-movant pursuant to Rule 12(N)(3) of the Local Rules of this court. Because the parties have submitted cross-motions for summary judgment, the court cites to four different documents:

Plaintiffs' 12(M) Statement ("Pls.' 12(M)");
Defendants' 12(M) Statement ("Defs.' 12(M)");
Plaintiffs' 12(N) Statement ("Pls.' 12(N)"); and
Defendants' 12(N) Statement ("Defs.' 12(N)").
The term "Ex." refers to exhibits attached to the 12(M) and 12(N) Statements pursuant to Rules 12(M)(1) and 12(N)(1) of the Local Rules of this court and Rule 56(e) of the Federal Rules of Civil Procedure.

ance would own the home and lease it to the DuPage County Health Department ("County Health Department"). The County Health Department would select residents for the home and provide full-time staff members to operate the home. The Illinois Department of Public Aid ("IDPA") would fund the home on a per-resident basis. (Defs.' 12(M) ¶ 4; Pls.' 12(M), Ex. A, Rose Aff. ¶ 3; Pls.' 12(M) ¶ 6.)

The Alliance encountered immediate and sustained opposition from prospective neighbors of the home.[2] In August 1994, the Alliance announced that the home would be located at 408 Braemer Court, a cul du sac in quiet residential subdivision of Naperville. The neighborhood homeowners association reacted with hostility, hiring an attorney to help it oppose the Alliance's plan to open the home at that location. In an effort to block the Alliance's plan, the homeowners contacted their congressman, the Mayor of Naperville, and members of the Naperville City Council. On August 16, 1994, over one hundred neighborhood residents appeared at a meeting of the Naperville City Council and many spoke out against the plan. (Pls.' 12(M) ¶ 7; Pls.' 12(M), Ex. A, Rose Aff. ¶¶ 4–6.)

Shortly thereafter, Naperville attempted to revoke the Alliance's Block Grant. Naperville claimed that the Alliance had committed "a substantial breach of [its] Agreement" with the city in that the Alliance applied for a Block Grant "to provide a single family residence to house six very low-income, mentally ill individuals" but later "stated that it intend[ed] to house eight individuals, rather than six." (Pls.' 12(M), Ex. C, Newman letter.) However, after a meeting attended by representatives of the Alliance, officials from Naperville, and officials from several federal agencies, the Alliance and Naperville signed a Conciliation Agreement. (Pls.' 12(M) ¶ 10.)

Under the terms of the Conciliation Agreement, Naperville agreed to release funds for the Block Grant to the Alliance, allowing the Alliance to purchase the home at 408 Braemer Court. All parties agreed to submit the occupancy limitation issue to binding arbitration. (Pls.' 12(M), Ex. D, Conciliation Agreement.) The arbitrator was Nicholas J. Bua, a retired judge of the United States District Court for the Northern District of Illinois. After considering evidence and argument on both sides, he found that Naperville had violated the federal Fair Housing Act, and he entered an award in favor of the Alliance. He wrote that Naperville's attempt to hold the Alliance to the precise terms of the Block Grant contract for not more than six residents "was motivated by community opposition to the presence in their neighborhood of a group home for mentally disabled adults in violation of the Fair Housing Act." (Pls.' 12(M), Ex. E, Award ¶ 1.)

During the course of negotiation and arbitration between the Naperville and the Alliance, Naperville officials never mentioned any problem with any fire or safety code that would prevent mentally ill adults selected by the Health Department from occupying the home at 408 Braemer Court immediately. (Pls.' 12(M) ¶ 11.)

In reliance on the Conciliation Agreement and arbitration award, the County Health Department identified the mentally disabled adults who would live in the home at 408 Braemer. Among those selected were Judy

---

2. Defendants claim that the information in this paragraph and in the three paragraphs that follow is irrelevant to plaintiffs' motion for summary judgment. (Defs.' 12(N) ¶¶ 7–12.) The court disagrees. These paragraphs provide relevant background information by explaining the origins of the dispute between the Alliance and Naperville. Moreover, the information in these paragraphs is highly relevant to defendants' own motion for dismissal or summary judgment, which argues that plaintiffs' have no evidence of intentional discrimination on the part of defendants (Defs.' Mem. in Supp. at 11). Although defendants deny the relevance of the information contained in these four paragraphs, they do not deny the truth of the information and do not cite to contrary information in the record. For these reasons, the court deems the information admitted for present purposes. See Rule 56(e) of the Federal Rules of Civil Procedure (to avoid summary judgment non-movant "must set forth specific facts showing that there is a genuine issue for trial"); Local Rule 12(N)(3) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir.1994) (upholding strict enforcement of such rules); *see also* footnotes 5 and 6 below.

Doe and Chris Doe, two plaintiffs in this case. Judy Doe, Chris Doe, and the other individuals selected for the home were living in nursing homes at the time they were selected. Their placement in nursing homes was inappropriate because they did not have any physical disabilities. Moreover, they had normal IQ's and were not diagnosed with mental retardation or any other developmental disability. A number of those selected to live at 408 Braemer had lived independently before their illnesses landed them in nursing homes. Some of them had graduated from college. Some had been married and were grandparents. One had a nervous breakdown after her husband died and she found herself unable to live alone in her home. (Pls.' 12(M), Ex. I, Bartels test. at 8–12, Shepard test. at 55–57.)

The County Health Department sought to place Judy Doe, Chris Doe, and other mentally disabled adults at 408 Braemer Court in order to give them a home in their community and help them reintegrate into the community. All of those chosen to live at 408 Braemer Court expected it to be their permanent home. Some of them were working in the community already, moving in the direction of a vocational career. As in similar homes in other communities, each of the residents would share responsibilities for daily living tasks such as meal preparation, grocery shopping, and cleaning. They would eat most of their meals as a group. The residents would have twenty-four hour supervision by a trained staff. Although the residents could function unsupervised in many areas, they had been in nursing homes for some time and would probably feel more comfortable returning to the community in a supervised setting. (Pls.' 12(M), Ex. I, Bartels test. at 8–12, Shepard test. at 55–57; Pls.' 12(M), Ex. L, Shepard Decl.)

Anticipating that Judy Doe, John Doe, and other mentally ill adults would soon occupy the home at 408 Braemer Court, the County Health Department requested a letter of "certification of compliance with local fire codes as a single family residence" from the Office of the Naperville Fire Marshall. (Pls.' 12(M), Ex. F, Bartels letter.) On September 26, 1994, officials of the Naperville Fire Department conducted a fire safety inspection of the home at 408 Braemer. (Pls.' 12(M), Ex. G, Voiland letter.) Although the County Health Department asked that Naperville treat the home as a single family residence (in keeping with the practice of other communities where the Department operated group homes), the Fire Department treated the home as a "Residential Board and Care Occupancy" under the 1991 Life Safety Code. (Pls.' 12(M), Ex. G, Scheller Memo.; Pls.' 12(M), Ex. I, Nealon test. at 96–97.) The Fire Department refused to certify that the home satisfied the local fire code. (Pls.' Ex. G, Voiland letter.) This decision was announced to the public by Samuel T. Macrane, the Mayor of Naperville and a defendant in this case. On October 18, 1994, Mayor Macrane told the Naperville City Council that the city would not give the Alliance an occupancy permit for 408 Braemer Court until the home complied with the city's fire safety code. The City Attorney added that if 408 Braemer Court were occupied before it complied with the code, the Alliance could face fines of $500 per day. (Pls.' 12(M) ¶ 14.)

## II. NAPERVILLE'S FIRE PREVENTION CODE

The home at 408 Braemer Court sits in an area that Naperville has zoned "R1A," which denotes a "Low Density Single–Family Residence District." Under Section 6–6A–2 of the Naperville's zoning code, the only "permitted uses" in an area zoned "R1A" are:

1. Certain schools;

2. Golf courses;

3. Parks, playgrounds, and forest preserves;

4. Single-family detached dwellings; and

5. Residential-care homes.

(Pls.' 12(M) ¶ 48.)

Under Section 5–1D–1 of Naperville's fire prevention code, Naperville adopts the 1991 version of the Life Safety Code ("LSC"), published by the National Fire Protection Association ("NFPA"). (Defs.' 12(M) ¶ 5.) The LSC contains fire prevention standards for various types of structures and occupancies. The NFPA has published a new version of the LSC every three years since 1913. (*Id.* ¶ 6.) The federal government has

adopted the LSC for Medicare and Medicaid approved care provider facilities; and the state of Illinois has promulgated regulations providing that an agency that owns or rents a group home shall comply with the LSC "as applicable [and] as enforced by the local authorities." (*Id.* ¶¶ 17–19.)

In 1985, for the very first time, the LSC contained a chapter on "Residential Board and Care Occupancies." (Defs.' 12(M) ¶ 6.) The LSC defines a "Residential Board and Care Occupancy" ("RBCO") as a building "used for lodging and boarding of four or more residents, not related by blood or marriage to the owners or operators, for the purpose of providing personal care services." (Pls.' 12(M), Ex. P, LSC at 101–169.) Under the LSC,

"Personal care" means protective care of residents who do not require chronic or convalescent medical or nursing care. Personal care involves responsibility for the safety of the resident while inside the building. Personal care may include daily awareness by the management of the resident's functioning and whereabouts, making and reminding a resident of appointments, the ability and readiness for intervention in the event of a resident experiencing a crisis, supervision in the areas of nutrition and medication, and actual provision of transient medical care.

(*Id.* at 101–169.)

The Life Safety Code Handbook ("LSCH")—an authoritative guide to the LSC[3]—clarifies the definition of RBCO. The LSCH notes that the creation of a new occupancy for residential board and care facilities grew out concern over the high incidence of fatal fires in such facilities. (Defs.'

3. The court regards the LSCH as an authoritative guide to the interpretation of the LSC for four reasons. First, like the LSC, the LSCH is published by the NFPA. Second, the LSCH tracks the LSC subsection by subsection and discusses the LSC in authoritative, mandatory terms. Third, the parties refer to the LSCH in their statements of material fact and append portions of the LSCH to those statements. (Pls.' 12(M) ¶¶ 42–45 & Ex. R; Defs.' 12(N) ¶ 52 & Ex. C.) Fourth, the parties treat the LSCH as an actual part of the LSC. For example, plaintiffs state that "Section 22–1.1 of the LSC explains, in part, the reasons why heightened safety requirements are mandated for group homes." (Pls.' 12(M)

12(N), Ex. C, LSCH at 684.) Discussing the well-documented "fire fatality problem" in RBCO's, the LSCH notes that

residents of [RBCO's] are often unable to meet the demands of independent living and are at greater risk from fire than the general population. Typically, the victims of [RBCO] fires are the elderly or former mental health patients who have been released from various institutions. These residents may not require daily medical care but nonetheless may have disabilities that reduce their ability to save themselves in a fire.

(*Id.* at 683.) According to the LSCH, the NFPA has defined RBCO's as facilities that lodge "residents with substantial limitations, primarily those age 65 and over and former mental patients." (*Id.* at 684.)

In a further effort to distinguish RBCO's from other occupancies, the LSCH provides five examples of RBCO's:

(a) A group housing arrangement for physically or mentally handicapped persons who normally may attend school in the community, or otherwise use community facilities.

(b) A group housing arrangement for physically or mentally handicapped persons who are undergoing training in preparation for independent living, for paid employment, or for other normal community activities.

(c) A group housing arrangement for the elderly that provides personal care services but that does not provide nursing care.

¶ 42.) Defendants agree with this statement. (Defs.' 12(N) ¶ 42.) However, the passages quoted by plaintiffs and agreed to by defendants come from the LSCH, not the LSC. (Pls.' 12(M), Ex. R, LSCH.) The court also notes that the Assistant Fire Chief of Naperville appears to regard the LSCH as part of the LSC. At a hearing before the Interim Building Review Board of Naperville, he testified that the LSC "details fires back from the 1960s and '70s in group homes." (Pls.' 12(M), Ex. I, Voiland test. at 102–03.) However, that information appears in the LSCH, not the LSC. (Defs.' 12(N), Ex. C, LSCH at 683–84.)

(d) Facilities for social rehabilitation, alcoholism, drug abuse, or mental health problems that contain a group housing arrangement that provide personal care services but do not provide acute care.

(e) Other group housing arrangements that provide personal care services but not nursing care.

(Id. at 688–89.)

The LSC distinguishes between new and existing RBCO's. The chapter devoted to new RBCO's distinguishes between small facilities (housing up to sixteen residents) and large facilities (housing more than sixteen residents). The LSC also distinguishes between RBCO's with prompt evacuation capability, slow evacuation capability, and impractical evacuation capability. An RBCO has prompt evacuation capability if its residents have an evacuation capability "equivalent to the capability of the general population." (Pls.' 12(M), Ex. P, LSC at 101–169.) By distinguishing between new and existing RBCO's, between small and large RBCO's, and between RBCO's with prompt, slow, and impractical evacuation capabilities, the drafters of the LSC consciously sought to balance the documented need for fire protection against the burden that enhanced fire protection measures might impose on RBCO's. (Defs.' 12(M) ¶¶ 7–13.)

The 1991 LSC states that a new small RBCO with "prompt evacuation capability" should have a secondary means of escape, an enclosed interior stairway, door widths and latching meeting certain standards, protection of vertical openings, interior finishes with fire retardant material, a fire alarm system, smoke detectors, a sprinkler system, and smoke resistant walls and doors in corridors. (Id. ¶ 14.) The 1994 version of the LSC (which Naperville has not adopted) includes substantially the same requirements, with one exception: The 1994 version does not require that small RBCO's have a sprinkler system, provided that other fire safety measures are maintained. (Id. ¶ 16.)

According to the LSCH, these requirements for small RBCO's "are similar to the provisions for one- and two-family dwellings and lodging and rooming houses" under the LSC. (Defs.' 12(N), Ex. C, LSCH at 684.)

The LSC defines "lodging or rooming houses" as "buildings that provide sleeping accommodations for a total of sixteen or fewer persons on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants." With respect to lodging and rooming houses, the LSC requires, among other things, primary and secondary means of escape, protection of vertical openings, interior finishes with fire retardant material, enclosure of interior stairways, smoke detectors, separation of sleeping rooms, a fire alarm system, door closing requirements, and a sprinkler system. (Defs.' 12(M) ¶ 15.) With respect to single-family dwellings, however, the LSC does not require that they install sprinkler systems, enclose interior stairwells, or install fire alarm systems. (Pls.' 12(M) ¶ 49.)

In addition to the provisions of the LSC outlined above, the Naperville fire prevention code contains the following appeal provision:

Whenever the Bureau of Fire Prevention shall disapprove an application or refuse to grant a permit applied for, or when it is claimed that the provisions of the Code do not apply or that the true intent and meaning of the Code have been misconstrued or wrongly interpreted, the applicant may appeal from the decision of the Bureau to the Building Review Board.

(Defs.' 12(M), Ex. G., Code § 5–1D–7.) A footnote appears at the end of this provision. It states: "See Title 2, Chapter 4 of this Code." (Id.) According to Title 2, Chapter 4 of the Naperville Municipal Code, a person wishing to appeal a decision by the Bureau of Fire Prevention must seek a variation from the Building Review Board. To apply for a variation, a person must file a formal application, pay a $200 fee, and guarantee payment of "all the legal, technical and staff expenses that may be incurred by the City" in considering the application. (Pls.' 12(M), Ex. J, Code § 2–4–4.)

According to the Naperville Municipal Code, the Building Review Board "shall consist of nine (9) members," including (1) an engineer or an architect, (2) a plumber, (3) an electrician, (4) a person from "the construc-

tion contracting industry," and (5) a construction worker. (*Id.* § 2–4–1.) The Municipal Code further states that

> [t]he remaining four (4) members should also have specialized training and/or experience applicable to one or more of the fields of expertise which the Board will be dealing with, except that up to two (2) members may be lay persons representing the citizenry at large.

(*Id.*) The nine members of the Building Review Board are appointed to three-year terms "by the Mayor, subject to the prior approval of the City Council." (*Id.*) The Municipal Code includes a "Residence Requirement" for members of the Building Review Board, stating that "[e]ach member shall either be a resident of the City or shall have his principal employment within the City." (*Id.*) [4]

The Building Review Board is empowered to investigate any application for a variation from city regulations, including fire regulations, and make recommendations to the City Council. The City Council has the ultimate authority and responsibility of granting or denying a variation. (*Id.* §§ 2–4–3, 2–4–6.)

### III. ORIGINS OF THE LITIGATION

As noted above, the Naperville Fire Department refused to certify that the home at 408 Braemer Court complied with the Naperville fire prevention code. The Fire Department characterized the home as small RBCO with a prompt evacuation capability and applied the relevant provisions of the 1991 LSC. (Pls.' 12(M), Ex. G, Scheller Memo.) In light of the RBCO provisions of the LSC, the Fire Department stated that it would not give the Alliance an occupancy permit for 408 Braemer Court unless the Alliance installed an automatic sprinkler system, constructed an exterior stairwell, enclosed all interior stairwells, and made certain other changes. (Pls.' 12(M) ¶ 15.)

In characterizing the evacuation capability of the home as "prompt," the Fire Department recognized that the residents of the home "had no physical or mental limitations on their ability to evacuate the property." (Defs.' 12(N) ¶ 17.) Apart from this general characterization, the Fire Department did not consider the specific physical characteristics of the individuals who planned to live in the home. (Defs.' 12(N), Ex. A, Voiland Aff. ¶ 2.) In any event, the parties in this case agree that

> [n]one of the proposed residents has any unique or special needs which require them to be treated any differently from nondisabled residents of a single family

---

**4.** In paragraph 20 of its 12(N) Statement, Naperville makes the following statement:

> whether *any* Naperville ordinance mandated that all Board members be residents of Naperville is either irrelevant, or in dispute. (See Naperville's Rule 12(M) Statement in support of summary judgment.)

(Pls.' 12(N) ¶ 20 (emphasis added).) However, contrary to this statement, Naperville and its counsel must know that Section 2–4–1, Subsection 1.3, of the Naperville Municipal Code is entitled "Residence Requirements." It states that "[e]ach member [of the Building Review Board] shall either be a resident of the City or shall have his principal employment within the City." In fact, the Naperville City Attorney sent a copy of this provision to counsel for the Alliance, along with a cover letter stating:

> Per our discussion yesterday, enclosed please find a photocopy of Title 2 Chapter 4 of the Naperville City Code. This chapter establishes the Naperville Building Review Board as well as its powers, duties, and functions and the process for obtaining variations from the fire regulations of the City.

A copy of this letter and the relevant Code provision appear as Exhibit J to plaintiffs' 12(M) Statement, which plaintiffs' cite in Paragraph 20 of their 12(M) statement.

In support of its statement that the residence requirement is either irrelevant or disputed, Naperville cites its entire 12(M) statement. However, Naperville and its counsel must know that nothing in Naperville's 12(M) statement suggests that the residence requirement is irrelevant or disputed. Naperville and its counsel know or should know that a general citation to an entire 12(M) statement violates Rule 56(c) of the Federal Rules of Civil Procedure, which requires that the party opposing summary judgment provide *"specific facts* showing that there is a genuine issue for trial" (emphasis added). Naperville and its counsel know or should know that such a general citation violates Rule 12(N)(3) of the Local General Rules of this court, which requires that any disagreement with a fact in a 12(M) Statement be supported by *"specific references* to the affidavits, parts of the record, and other supporting materials relied on" (emphasis added).

This is not the only inappropriate statement in Naperville's 12(N) Statement. *See* footnote 2 above and footnotes 5 and 6 below.

home. They do not suffer from physical limitations. They are able to fully comprehend and follow fire safety instructions. (Pls.' 12(M) ¶ 18.)

When Naperville refused to allow immediate occupancy of the home at 408 Braemer Court, the County Health Department asked that the city either declare that the LSC did not apply to the home or (alternatively) waive certain provisions of the LSC as a reasonable accommodation to prospective residents of the home. (*Id.* ¶ 16.) In response, Naperville stated that the Alliance would have to ask the Naperville Building Review Board for a "variation" from the Naperville fire code. (Pls.' 12(M), Ex. J, Roth letter.) At that time, the Building Review Board had not considered an application for any kind of variation in over ten years. In fact, Naperville did not have an appointed Building Review Board. (Pls.' 12(M) ¶ 19; Defs.' 12(M) ¶ 22.)

On November 8, 1994, under protest, the Alliance applied for a variation from the fire code and paid the required fee of $200. (Pls.' 12(M), Ex. K, Application.) Naperville then created the "Interim Naperville Building Review Board" (Pls.' 12(M), Ex. M, Findings & Follow–Up), alternatively known as the "Interim Building Advisory Board," the "interim committee of the building review board," or the "*ad hoc* Board." (Pls.' 12(M), Ex. I, Hearing at 1, 4; Defs.' 12(M) ¶ 22.) The Interim Naperville Building Review Board ("Interim Board") consisted of (1) Allan Rohlfs, the Chief of the Naperville Fire Department and a defendant in this case, (2) John Fennell, Chief of the Elmhurst Fire Department, (3) Richard Swanson, Chief of the Winfield Fire Department, (4) Dario Conte Russian, Naperville's Chief Building Official, and (5) Jack Ryan, Executive Director of Little Friends. (Pls.' 12(M) ¶¶ 20, 4; Pls.' 12(M), Ex. I, Hearing at 2.)

At a public hearing on November 22, 1994, the Interim Board took testimony from three representatives of the County Health Department, two mentally disabled persons living in group homes outside Naperville, and two representatives of the Alliance, as well as the Assistant Fire Chief of Naperville. (Pls.' 12(M), Ex. I, Hearing.) Representatives of the County Health Department testified that the prospective residents of 408 Braemer Court were mentally ill adults who had no special needs requiring increased fire safety. They stated that the prospective residents were not mentally retarded and had no physical or developmental disabilities. They added that the type of funding used by the County Health Department would prevent any individuals with physical or developmental disabilities from living at 408 Braemer Court. (Pls.' 12(M), Ex. I, Bartels test. at 8–12, 29, Shepard test. at 55–57.)

On November 28, 1994, after deliberation, the Interim Board issued its "Findings and Recommendations to the Naperville City Council." The Interim Board found, among other things, that:

2. The Naperville Fire Department properly applied the 1991 Life Safety Code, as written, to the property at 408 Braemer Court.

. . . .

4. The variances requested are a major deviation from the 1991 and 1994 Life Safety Codes, and would compromise the public life and property interests protected under those Codes.

(Pls.' 12(M), Ex. M, Findings.) On the basis of these findings, the Interim Board recommended that the City Council deny the request for a variance from the requirement that the Alliance install a sprinkler system and a fire alarm monitoring system wired into the Naperville Fire Department. However, the Interim Board did recommend that the City Council waive certain LSC requirements that would seriously affect the aesthetic or financial value of the home or cause the home to take on the physical appearance of an institution. Specifically, the Interim Board recommended that the City Council grant the request for a variance from the requirement that the Alliance fully enclose the front staircase and build a second means of egress from the second floor of the house. The Interim Board also recommended that the City Council give the County Health Department and the Alliance 120 days to comply with all requirements, and that the City Council permit occupancy of the home in

the mean time. (Defs.' 12(M) ¶ 23; Pls.' 12(M), Ex. M, Findings.)

On December 6, 1994, the Naperville City Council formally "accepted the findings and recommendations of the Interim Naperville Building Review Board regarding the Group Home located at 408 Braemer Court." (Pls.' 12(M), Ex. M, Follow–Up.) Six members of the Naperville City Council are defendants in this case. (Pls.' 12(M) ¶ 5.)

The Alliance has not installed a sprinkler system and a fire alarm monitoring system at 408 Braemer Court. The Alliance argues that enforcing these requirements violates the Fair Housing Act and that complying with these requirements would impose a financial hardship on the Alliance. (Pls.' 12(M) ¶ 33; Pls.' 12(M), Ex. A, Rose Aff. ¶¶ 10–13.) Specifically, the Alliance estimates that it would cost $12,800 to install a sprinkler system; it would cost $7,000 to $8,000 to install a sprinkler monitor, smoke detectors, and a central alarm to the fire department; and it would cost $280 (plus $40 monthly) to establish a phone monitoring system. (Pls.' 12(M) ¶ 33; Pls.' 12(M), Exs. N & O.) Naperville estimates that it would cost $3,240 (plus $38 monthly) to install a hard-wired smoke detector and fire alarm system; and it would cost "significantly less" than $12,800 to install a sprinkler system. (Defs.' 12(N), Ex. A, Voiland Aff. ¶¶ 4–6.) With respect to the sprinkler system, Naperville does not provide a specific cost estimate, stating only that "[t]here is a substantial range in cost based on the system and the contractor used." (Defs.' 12(N) ¶ 33.) Of the five group homes for the mentally disabled run by the County Health Department, the home at 408 Braemer Court is the only one that is required to install an automated sprinkler system. (Pls.' 12(M) ¶ 34; Pls.' 12(M), Ex. B, Bartels Aff. ¶ 14.) [5]

Because the Alliance has not installed a sprinkler system and a fire alarm monitoring system, Naperville has refused to certify that 408 Braemer Court is fit for occupancy by more than three unrelated persons. Thus, although the Alliance selected six prospective residents of the home in September of 1994, only three of the six have moved into the home. (Pls.' 12(M) ¶ 12; Pls.' 12(M), Ex. B, Bartels Aff. ¶¶ 6, 9.) Judy Doe and Chris Doe are among the prospective residents who have not been able to move into the home. (Pls.' 12(M) ¶ 12.)

The County Health Department has detailed the safety procedures it employs at 408 Braemer Court and at similar group homes. All bedrooms have fireproof mattresses and a window to the outside. The home contains three fire extinguishers as well as smoke detectors audible to each sleeping room. Evacuations routes are posted next to every exit, and phones are speed dialed with emergency phone numbers. (Pls.' 12(M) ¶¶ 26–27; Pls.' 12(M), Ex. I, Samuel test. at 39–41.) Cooking in the home is supervised closely, and smoking is prohibited entirely. (Pls.' 12(M) ¶ 31; Pls.' 12(M), Ex. I, Samuel test. at 48, 55–56.) The home is staffed twenty-four hours a day.[6] All staff members are

---

5. Although defendants disagree with the preceding sentence (Defs.' 12(N) ¶ 34), they fail to state why they disagree and they fail to support their disagreement with specific citations to the record. For these reasons, the court regards the preceding sentence as admitted for present purposes. *See* Rule 56(e) of the Federal Rules of Civil Procedure (to avoid summary judgment non-movant "must set forth specific facts showing that there is a genuine issue for trial"); Local Rule 12(N)(3) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir.1994) (upholding strict enforcement of such rules); *see also* footnote 2 above and footnote 6 below.

6. In support of this and other facts contained in this paragraph and the following paragraph, plaintiffs' cite to testimony by officials of the County Health Department before the Interim Naperville Building Review Board. Defendants apparently disagree with certain of these facts, including the fact that the home is staffed twenty-four hours a day and the fact that fire safety drills are conducted regularly. (Defs.' 12(N) ¶ 31.) In support of their disagreement, defendants complain that the hearing before the Interim Board was not a "fully contested evidentiary hearing." (*Id.*) However, nothing in Rule 56 of the Federal Rules of Civil Procedure or Rule 12 of the Local Rules of this court requires that a movant base his or her 12(M) Statement on a "fully contested evidentiary hearing." Although defendants apparently challenge the source of plaintiffs' information, defendants do not cite to any contrary information in the record. For

trained in how to evacuate the house and how to use the fire extinguishers; and all staff members are trained in first aid and CPR. (Pls.' 12(M) ¶¶ 28; Pls.' 12(M), Ex. I, Samuel test. at 42.)

Before the County Health Department selects a person to live at 408 Braemer Court, the Department assesses his or her ability to function appropriately in the home. When a new resident arrives at the home, the staff administers a "capability for self-preservation" test, which involves recognizing danger signals, knowing what to do in the event of a fire, and running through evacuation procedures. A new resident must repeat this test until he or she passes. The home conducts an initial evacuation drill for all residents. Within sixty days of the initial drill, the home conducts an unannounced evacuation from the house, usually from a sleeping area.[7] The longest it has ever taken to evacuate a group home run by the County Health Department was one and one-half minutes. The home at 408 Braemer Court was evacuated in 25 seconds, from sleep. (Pls.' 12(M) ¶¶ 29–30; Pls.' 12(M), Ex. I, Samuel test. at 43, 46.)

The Alliance, Chris Doe, and Judy Doe allege that Naperville, its fire chief, its mayor, and six members of its City Council have violated the Fair Housing Amendments Act of 1988. Plaintiffs move for summary judgment. Defendants move for dismissal or summary judgment.

### Analysis

■ A court renders summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court will not render summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ On a motion for summary judgment, the movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmovant must then "set forth specific facts demonstrating that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). In determining whether a genuine issue of material fact precludes summary judgment, the court reviews the evidence and draws all inferences "in the light most favorable to the nonmovant." *Bank Leumi*, 928 F.2d at 236; *FDIC v. Knostman*, 966 F.2d 1133, 1140 (7th Cir.1992).

### I. THE FAIR HOUSING AMENDMENTS ACT

■ Plaintiffs allege that defendants have violated the Fair Housing Amendments Act of 1988 ("FHAA"), codified as 42 U.S.C. §§ 3601 to 3631. Congress passed the original Fair Housing Act as Title VIII of the Civil Rights Act of 1968. The FHAA of 1988 expanded the Fair Housing Act by extending "the principle of equal housing opportunity to handicapped persons." H.R.Rep. No. 711, 100th Cong., 2nd Sess., at 13 (1985) ("House Report"). The FHAA does this by making handicapped persons a protected class under the statute. *Id.* at 17; *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir. 1995).

■ The FHAA makes it unlawful to discriminate in the sale or rental of a dwelling because a buyer, renter, or prospective resident has a handicap. 42 U.S.C. § 3604(f)(1). The FHAA also makes it unlawful "to otherwise make unavailable or deny" a dwelling to a buyer, renter, or pro-

---

these reasons, the court deems the information admitted for present purposes. *See* Rule 56(e) of the Federal Rules of Civil Procedure; Local Rule 12(N)(3); *Waldridge v. American Hoechst Corp.*,

24 F.3d 918 (7th Cir.1994); *see also* footnotes 2 and 5 above.

7. *See* footnote 6 above.

spective resident because of handicap. *Id.* Unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Under the FHAA, a person is "handicapped" if he or she has "a physical or mental impairment which substantially limits one or more of [his or her] major life activities," or if he or she has "a record of having such an impairment" or is "regarded as having such an impairment." 42 U.S.C. § 3602(h).

 The FHAA is "a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir.1995). In passing the FHAA, Congress recognized that "[t]he right to be free from housing discrimination is essential to the goal of independent living." House Report at 18. To further this goal, the FHAA represents

> a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

*Id.* In light of the FHAA's broad mandate, courts have accorded a "generous construction" to its antidiscrimination prescriptions. *City of Edmonds v. Oxford House, Inc.,* — U.S. ——, —— n. 11, ——, 115 S.Ct. 1776, 1783 n. 11, 1780, 131 L.Ed.2d 801 (1995) (citation omitted). Applying the FHAA, "courts have consistently invalidated a wide range of municipal licensing, zoning and other regulatory practices affecting persons with disabilities." *Potomac Group Home Corp. v. Montgomery County*, 823 F.Supp. 1285, 1294 (D.Md.1993) (citations omitted).

 In an action under the FHAA, a plaintiff may prevail on any one of three theories: (1) disparate treatment, also called intentional discrimination, (2) disparate impact, also called discriminatory effect, or (3) failure to accommodate. *Bangerter*, 46 F.3d at 1500–02; Schwemm, *Housing Discrimination* § 11.5(3)(c) at 11–58 to 11–59 (1995). In this case, plaintiffs prevail on the first theory as well as the third theory.

## II. IDENTIFYING FACIAL DISCRIMINATION

 Plaintiffs allege that the Naperville fire prevention code violates the FHAA on its face because it "stereotypes all persons with mental disabilities and does not allow for consideration of the unique or special needs of the individual residents." (Pls.' Br. in Supp. at 2; *see also id.* at 15–16.) A plaintiff who challenges a law that "facially single[s] out the handicapped and appl[ies] different rules to them" states a claim for disparate treatment. *Bangerter*, 46 F.3d at 1500. In such a case, "a plaintiff need not prove the malice or discriminatory animus of a defendant." *Id.* at 1501 (citations and footnote omitted); *see International Union v. Johnson Controls, Inc.*, 499 U.S. 187, 199, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."). Thus, "a plaintiff makes out a prima facie case of intentional discrimination under the FHAA merely by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment." *Bangerter*, 46 F.3d at 1501.

 Some facially discriminatory laws are easy to identify because they use the word "handicapped" or the word "disabled." For example, a law requiring that "group homes for the mentally or physically handicapped" obtain a special permit expressly singles out the handicapped for special treatment. *Id.* at 1494, 1500. Other facially discriminatory laws do not use the word "handicapped" or the word "disabled" but discriminate on their face nonetheless. An example would be a law that (1) prohibits any new "family care home" from locating within 1000 feet of any existing "family care

home" and (2) defines "family care home" as a facility where "permanent care" or "professional supervision" is present. *See Horizon House Developmental Servs., Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 687–90, 694 (E.D.Pa.1992), *aff'd,* 995 F.2d 217 (3rd Cir.1993). Such a law does not use the word "handicap" or "disability," yet the reach of the law clearly "coincides with the breadth of the definition of 'handicap' under the [FHAA]." *Id.* at 694. For this reason, such a law discriminates on its face against the handicapped. *Id.* That such a law "may incidentally catch within its net some unrelated groups of people without handicaps, such as juveniles or ex-criminal offenders" does not alter this conclusion. *Id.* (citations omitted).

The Seventh Circuit adopted a similar approach to identifying facial discrimination in *McWright v. Alexander,* 982 F.2d 222 (7th Cir.1992). Writing for the court, Judge Cudahy stated that an employer may not "use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination." *Id.* at 228. For example, a company that fired all employees with gray hair would commit intentional age discrimination because gray hair serves as a proxy for age. *Id.* Although a few young people have gray hair, Judge Cudahy explained,

> the "fit" between age and gray hair is sufficiently close that they would form the same basis for invidious classification. Similarly, discrimination "because of" handicap is frequently directed at an effect or manifestation of a handicap rather than being literally aimed at the handicap itself. Thus, a school's exclusion of a service dog has been held to be discrimination "because of" handicap, and no doubt a policy excluding wheelchairs would be such discrimination, even if the stated purpose of the policy were a benign one.

*Id.* (citations omitted). Although *McWright* involved the Rehabilitation Act of 1973, Congress wanted the FHAA to incorporate "the same definitions and concepts from that well-

established law." H.R.Rep. No. 711, 100th Cong., 2nd Sess., at 17 (1985) ("House Report").

In the case before the court, Naperville's fire prevention code ("Naperville code") discriminates on its face against handicapped persons. Part of the Naperville code, the 1991 Life Safety Code ("LSC"), includes special provisions for Residential Board and Care Occupancies ("RBCO's")—defined as facilities that house four or more unrelated persons "for the purpose of providing personal care services." Neither the Naperville code nor the LSC use the word "handicapped" or the word "disabled," but the special provisions of the LSC for RBCO's apply primarily to handicapped persons. "Personal care services" include "protective care" of residents, "responsibility for the safety" of residents, "intervention in the event of a crisis," and "supervision of medication and nutrition." Typically, a person needing "personal care services" such as these would fit the broad definition of "handicapped" under the FHAA.[8] Like the ordinance in *Horizon House* aimed at "family care homes," the RBCO provisions in the LSC discriminate on their face against handicapped individuals because their reach "coincides with the breadth of the definition of 'handicap' under the [FHAA]." *Horizon House,* 804 F.Supp. at 694.

Any doubt on this point is resolved by the discussion of RBCO's in the Life Safety Code Handbook ("LSCH"), an authoritative guide to the LSC.[9] According to the LSCH, the National Fire Protection Association ("NFPA")—which publishes the LSC and the LSCH—has defined RBCO's as facilities that lodge "residents with *substantial limitations,* primarily those age 65 and over and former mental patients." The term "substantial limitation" closely resembles the term "physical or mental impairment" in the FHAA's definition of handicap. In addition, the LSCH provides four specific examples of RBCO's:

> (a) A group housing arrangement for physically or mentally handicapped per-

---

**8.** As noted above, the FHAA defines "handicap" as "a physical or mental impairment which substantially limits one or more of [a] person's major life activities." 42 U.S.C. § 3602(h).

**9.** See footnote 3 above.

sons who normally may attend school in the community, or otherwise use community facilities.

(b) A group housing arrangement for physically or mentally handicapped persons who are undergoing training in preparation for independent living, for paid employment, or for other normal community activities.

(c) A group housing arrangement for the elderly that provides personal care services but that does not provide nursing care.

(d) Facilities for social rehabilitation, alcoholism, drug abuse, or mental health problems that contain a group housing arrangement that provide personal care services but do not provide acute care.

(Id. at 688–89.) [10] There is no doubt that in all four of these examples the residents would be classified as handicapped under the FHAA. Examples (a) and (b) actually use the word "handicapped." Examples (c) and (d) involve persons who are "handicapped" under the broad definition supplied by the FHAA, which encompasses alcoholism, drug abuse, and mental health problems, as well as "many of the difficulties associated with old age." Schwemm, *Housing Discrimination* § 11.5(2) at 11–48 to 11–49 (1995).

Defendants argue that the LSC does not discriminate on its face because an RBCO could (in theory) house people who are not handicapped, "such as juvenile delinquents, abused or neglected children, the homeless, orphans, battered women, and so on." (Defs.' Mem. in Supp. at 4; *see also* Defs.' Resp. at 4.) This argument is unpersuasive for two principal reasons. First, some of these purportedly non-handicapped groups may be "handicapped" under the FHAA's expansive definition of that word. For example, abused children and battered women may suffer from physical or mental impairments that substantially limit some of their life activities. Even if they do not suffer

from such impairments, they may have a record of such impairments or they may be regarded as having such impairments, making them "handicapped" under the FHAA. See 42 U.S.C. § 3602(h) (defining "handicap").

Second, defendants argument is unpersuasive because the groups they identify do not appear to constitute a meaningful proportion of RBCO residents. According to the LSCH, the NFPA has defined RBCO's as facilities that lodge "residents with substantial limitations," *primarily those age 65 and over and former mental patients* (emphasis added). Of the four specific examples of RBCO's provided by the LSCH, not one involves the purportedly non-handicapped groups identified by defendants. The court does not doubt that at least some potential residents of RBCO's are not handicapped under the FHAA. However, the fact that a law "may incidentally catch within its net some unrelated groups of people without handicaps" does not alter the conclusion that the law discriminates on its face against the handicapped. *Horizon House,* 804 F.Supp. at 694 (citations omitted).

■ Defendants also argue that the LSC does not discriminate against handicapped persons because it "applies regulations based on the use of the property, rather than on the physical or mental capabilities of its residents." (Defs.' Resp. at 2; *see also id.* at 4; Defs.' Mem. in Supp. at 5.) [11] It is true that the RBCO provisions of the LSC apply to buildings that provide personal care services, rather than buildings that house handicapped persons. However, this is a distinction without a difference, since individuals who need personal care services are typically handicapped. As the Seventh Circuit indicated in *McWright,* discrimination that is aimed at "an effect or manifestation of a handicap rather than being literally aimed at the hand-

---

10. The fifth example provided by the LSCH— "[o]ther group housing arrangements that provide personal care services but not nursing care"—is a general catch-all category. Since this example does little more than restate the phrase, "personal care services," it does not help clarify the meaning of that phrase.

11. Defendants' further argument that the LSC discriminates because of family status rather than handicap is discussed below.

icap itself" may still qualify as discrimination. *McWright,* 982 F.2d at 228.

## III. JUSTIFYING FACIAL DISCRIMINATION

 If a plaintiff in an action under the FHAA shows that a statute discriminates on its face, "then the burden is on the defendant to justify the discriminatory classification." *Association for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth,* 876 F.Supp. 614, 620 (D.N.J.1994); *see Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1501 (10th Cir.1995) (plaintiff need not address possible justifications for discriminatory law to state claim for facial discrimination) (citations omitted). In this case, defendants seek to justify the safety standards imposed on the home at 408 Braemer Court on the ground that such requirements ensure the safety of the home's residents. The Sixth Circuit addressed a similar justification in *Marbrunak, Inc. v. City of Stow,* 974 F.2d 43, 47 (6th Cir.1992)—a case cited with approval by the Seventh Circuit in *United States v. Village of Palatine,* 37 F.3d 1230, 1234 (7th Cir.1994). In *Marbrunak,* the City of Stow imposed special safety requirements on a residence for four mentally retarded adult women, in keeping with a city zoning ordinance. The Sixth Circuit held that the zoning ordinance as applied to Marbrunak violated the FHAA. The court explained that a city "may impose standards which are different from those to which it subjects the general population, so long as that protection is demonstrated to be warranted by the unique and specific needs and abilities of those handicapped persons." *Marbrunak,* 974 F.2d at 47. The Stow ordinance failed this test because it imposed " 'blanket' fire and safety restrictions [on] *all* homes wherein developmentally disabled persons live[d], regardless of the individual abilities of the residents." *Id.* at 47 (quoting district court) (emphasis in original). For example, the ordinance required that Marbrunak "install an alarm system interconnected to a ceiling sprinkler system [without offering any] evidence that any of the residents of the home [were] hearing impaired or otherwise unable to respond to the standard smoke alarms" already in the home. *Id.* The holding in *Marbrunak,* and

the reasoning supporting it, are consistent with the legislative history of the FHAA, which states that "[g]eneralized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion." H.R.Rep. No. 711, 100th Cong., 2nd Sess., at 18 ("House Report"). *Marbrunak* is also consistent with other cases interpreting the FHAA. *E.g., Potomac Group Home Corp. v. Montgomery County,* 823 F.Supp. 1285, 1300 (D.Md.1993) (any requirement imposed on handicapped must correlate "to the actual abilities of the persons upon whom it is imposed"); *Bangerter,* 46 F.3d at 1503–04 (same).

In the case before the court, plaintiffs offer extensive evidence indicating that a sprinkler system and a fire alarm monitoring system are not necessary to ensure the safety of the actual and prospective residents of 408 Braemer Court. Plaintiffs note that 408 Braemer Court was a single family residence before the Alliance purchased the home, and the LSC does not require that single-family residences install sprinkler systems and fire alarm monitoring systems. The present and prospective residents of 408 Braemer Court suffer from mental illnesses, but they have normal IQ's and they are not mentally retarded. Moreover, the residents have no physical or mental limitations on their ability to evacuate the property. The type of funding used by the County Health Department would prevent the Department from placing any individuals with physical or developmental disabilities at 408 Braemer Court.

The home at 408 Braemer Court has three fire extinguishers as well as smoke detectors audible to each sleeping room. All bedrooms have fireproof mattresses and a window to the outside. Evacuations routes are posted next to every exit, and phones are speed dialed with emergency phone numbers. Cooking in the home is supervised closely, and smoking is prohibited entirely. The home is staffed twenty-four hours a day, and all staff members are trained in how to evacuate the house and how to use the fire extinguishers. When a new resident arrives at the home, the staff administers a "capability for self-preservation" test, which the resident

must repeat until he or she passes. The home conducts evacuation drills. The longest it has ever taken to evacuate a group home run by the County Health Department was one and one-half minutes. The home at 408 Braemer Court was evacuated in 25 seconds, from sleep.

In response to this evidence, defendants offer no specific evidence indicating that a sprinkler system and a fire alarm monitoring system are necessary to ensure the safety of the actual and prospective residents of 408 Braemer Court. In fact, defendants concede that

> [n]one of the proposed residents [of 408 Braemer Court] has any unique or special needs which require them to be treated any differently from nondisabled residents of a single family home. They do not suffer from physical limitations. They are able to fully comprehend and follow fire safety instructions.

(Pls.' 12(M) ¶ 18; Defs.' 12(N) ¶ 18.) In characterizing the evacuation capability of the home as "prompt," the Naperville Fire Department recognized that the residents of the home "had no physical or mental limitations on their ability to evacuate the property." Apart from this general characterization, the Fire Department did not consider the specific physical characteristics of the individuals who planned to live in the home.

In light of *Bangerter* and the other cases cited above, plaintiffs' complete failure to offer specific evidence leads the court to conclude that, as applied to plaintiffs in this case, the Naperville fire prevention code violates the FHAA. Instead of offering specific evidence, defendants ask the court to defer to (A) certain generalized assumptions codified in the Life Safety Code and (B) the judgment of the Interim Naperville Building Review Board.

### A. The Life Safety Code

▪ Defendants repeatedly state that the RBCO provisions in the LSC are the result of a conscious effort to combat the high incidence "of tragic fires in group homes, balanced with a need for standards not so burdensome as to prohibit group homes from operating." (Defs.' Mem. in Supp. at 6; *see also id.* at 6–7 n. 1; Defs.' Resp. at 6–7 n. 3.)

However, the intent of the drafters of the LSC is irrelevant here. The discussions cited by plaintiffs took place before Congress passed the FHAA in 1988, so the drafters could not have considered the specific mandates of the FHAA when they drafted the LSC. *See Marbrunak, Inc. v. City of Stow,* 974 F.2d 43, 48 (6th Cir.1992). In any event, "the motives of the drafters of a facially discriminating ordinance ... [are] irrelevant to a determination of the lawfulness of the ordinance. The court must focus on the explicit terms of the ordinance." *Association for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth,* 876 F.Supp. 614, 620 (D.N.J.1994) (citations omitted).

Focusing on the explicit terms of the LSC, defendants' argue that the RBCO provisions of the LSC are "tailored to the use of [a] facility." (Defs.' Resp. at 6.) Specifically, an RBCO "is categorized as having a 'prompt,' 'slow,' or 'impractical' evacuation capability, based on the conditions of the residents who live there." (Defs.' Mem. in Supp. at 8.) Naperville gave the home at 408 Braemer Court a "prompt" rating—indicating that its residents have an evacuation capability equivalent to that of the population at large. Defendants argue that the LSC does not violate the FHAA because it keys its requirements to the evacuation capabilities of the residents of an RBCO, and this "assures some relationship between the requirements of the [LSC] and the disabilities of the group home residents." (Defs.' Resp. at 7.)

▪ The court agrees with defendants that by dividing RBCO's into three categories the LSC assures "some" relationship between the requirements it imposes and the abilities of the RBCO residents it affects. However, nothing in the LSC ensures that this relationship will satisfy the FHAA, which mandates that any such requirements correspond to the "unique and specific needs and abilities of [the] handicapped persons" affected. *Marbrunak,* 974 F.2d at 47. That the LSC has three sets of safety standards instead of one does not ensure such a correspondence. The LSC may impose overly-protective requirements in all three catego-

ries. The LSC may impose overly-protective requirements in one or two categories. Within a category, the LSC may impose requirements appropriate to the residents of some RBCO's but not appropriate to the residents of other RBCO's. In short, the fact that the LSC employs three generalizations instead of one generalization does not guarantee that the requirements imposed on a particular RBCO will satisfy the FHAA.

In this regard, it should be noted that the requirements imposed by the LSC on "prompt" RBCO's—a secondary means of escape, an enclosed interior stairway, a fire alarm system, and a sprinkler system—appear similar to the requirements struck down as overly-protective in *Marbrunak. See Marbrunak*, 974 F.2d at 45 n. 1 (listing requirements). This is noteworthy because the residents of the home in *Marbrunak* were mentally retarded, while the residents of the home at 408 Braemer Court are not. Like the ordinance in *Marbrunak*, the LSC requires that plaintiffs "install an alarm system interconnected to a ceiling sprinkler system [without providing any] evidence that any of the residents of the home are hearing impaired or otherwise unable to respond to the standard smoke alarms" already in the home. *Id.* at 47. In this case, it is undisputed that residents of 408 Braemer Court have no physical or mental limitations on their ability to evacuate the home. It is also undisputed that the home incorporates many safety features, trains its staff, tests its residents in evacuation procedures, and conducts evacuation drills. There is no evidence in the record that the residents of 408 Braemer Court require a sprinkler system and a fire alarm monitoring system to ensure their own safety. The generalizations of the LSC do not make up for this lack of specific evidence.

Defendants argue that the safety requirements imposed on new small RBCO's with prompt evacuation capability resemble those imposed on "lodging and rooming houses"— defined as "buildings that provide sleeping accommodations for a total of 16 or fewer persons on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants." Therefore, defendants argue, the

LSC imposes the same requirements on owners of homes for unrelated *handicapped* persons (with prompt evacuation capabilities) that it imposes on owners of homes for unrelated *non-handicapped* persons. Because the LSC imposes the same requirements on facilities for handicapped and non-handicapped persons, defendants conclude that the LSC does not discriminate against handicapped persons and does not violate the FHAA. (Defs.' Mem. in Supp. at 4–5; Defs.' Resp. at 6–7.)

The main problem with this argument is that residents of lodging and rooming houses are not a protected class under the constitution or under any statute, whereas handicapped persons are a specifically protected class under the FHAA. H.R.Rep. No. 711, 100th Cong., 2nd Sess., at 17 (1985) ("House Report"); *Bangerter*, 46 F.3d at 1503. A municipality may impose special requirements on residents of lodging and rooming houses provided that such requirements bear a rational relationship to some legitimate governmental purpose. Undoubtedly, such requirements could rest on generalized assumptions about residents of lodging and rooming houses. For example, a municipality could impose special requirements on lodging and rooming houses based on the assumption that the residents generally do not know one another, do not stay for long periods of time, do not know about the safety features of the house, and so forth. By contrast, under the FHAA, a municipality may impose special requirements on the handicapped residents of an RBCO only if such requirements are "warranted by the unique and specific needs and abilities of those handicapped persons." *Marbrunak*, 974 F.2d at 47. Because the handicapped are a protected class under the FHAA, special requirements imposed on them must be more than "rationally related to a legitimate governmental purpose." *Bangerter*, 46 F.3d at 1503.

In this regard, the court expressly declines to follow *Familystyle of St. Paul, Inc. v. City of St. Paul*, 923 F.2d 91 (8th Cir.1991), which upheld a city ordinance that discriminated against mentally ill persons on the ground that the ordinance was "rationally related to

a legitimate governmental purpose." *Id.* at 94. In reaching this conclusion, the *Familystyle* court relied on the fact that handicapped persons are not a suspect class under the Equal Protection Clause of the Constitution. *Id.* This court joins other courts and commentators in rejecting both the holding and the reasoning of *Familystyle.* As the Tenth Circuit pointed out in *Bangerter,* the use of Equal Protection analysis is clearly misplaced in a case brought under the FHAA. Although the handicapped may not be a protected class for constitutional purposes, "the FHAA specifically makes the handicapped a protected class for purposes of a statutory claim—they are the direct object of the statutory protection." *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1503 (10th Cir.1995); *see Schwemm, Housing Discrimination* § 11.5(3)(c) at 11–69 (1995) ("The flaws in this part of the *Familystyle* opinion are manifest. The legislative history of the [FHAA] shows that it was intended to provide substantially more protection against governmental restrictions on group homes for handicapped persons" than that provided by the Equal Protection Clause.)

In a further elaboration of their argument, defendants contend that the LSC discriminates on the basis of family status rather than handicap, and that the constitution allows such discrimination. (Defs.' Mem. in Supp. at 5–6; Defs.' Resp. at 7–8.) Under the LSC, safety requirements imposed on handicapped residents of RBCO's with prompt evacuation capabilities are (1) stricter than safety requirements imposed on residents of single-family homes, but (2) similar to safety requirements imposed on residents of "lodging and rooming houses." From these facts, defendants deduce that the LSC imposes special requirements on residents of RBCO's with prompt evacuation capabilities *because* the residents are unrelated (not because they are handicapped). However, this argument has no basis in fact or law. Factually, defendants offer no evidence whatsoever that the drafters of the LSC imposed requirements on residents of RBCO's with prompt evacuation capabilities *because* the residents were unrelated (rather than handicapped). Neither the LSC nor the LSCH mentions "non-relatedness" of RBCO residents as a reason for imposing safety requirements on RBCO's. On the other hand, the LSCH does state that residents of RBCO's "have disabilities that reduce their ability to save themselves in a fire." (Defs.' 12(N), Ex. C at 683, quoting NFPA memo.) This contradicts defendants' argument.

Legally, the cases cited by defendants do not support their argument. In *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), for example, the Supreme Court held that a zoning ordinance limiting occupancy of one-family dwellings to traditional families or groups of two unrelated persons did not violate the Equal Protection Clause because the ordinance bore "a rational relationship to a [permissible] state objective." *Id.* at 8, 94 S.Ct. at 1540 (citing *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971)) (alteration in *Boraas* ). In applying the "rational relationship" standard, the Court stressed that the ordinance did not threaten a fundamental right or discriminate against a protected class. *See id.* at 7, 94 S.Ct. at 1540 ("The ordinance involves no 'fundamental' right guaranteed by the Constitution."); *id.* at 6, 94 S.Ct. at 1539 ("If the ordinance segregated one area only for one race, it would immediately be suspect."). Because *Boraas* did not involve a fundamental right or a protected class, the court applied a "rational relationship" analysis to the ordinance at issue. In contrast to *Boraas,* the case before the court involves a protected class under the FHAA. Therefore, the court applies stricter standard: "Any special requirements placed on housing for the handicapped based on concerns for the protection of the disabled themselves ... must have a 'necessary correlation to the actual abilities of the persons upon whom [they are] imposed.'" *Bangerter,* 46 F.3d at 1503–04 (quoting *Potomac Group Home Corp. v. Montgomery County,* 823 F.Supp. 1285, 1300 (D.Md.1993)). The fact that the Supreme Court upheld the ordinance in *Boraas* based on a rational relationship analysis has no bearing on whether this court should uphold the Naperville fire prevention code under the much stricter stan-

dard established by the FHAA.[12]

In this case, defendants fail to offer any concrete evidence that the requirements imposed on the home at 408 Braemer Court "have a 'necessary correlation to the actual abilities of the persons upon whom [they are] imposed.'" The generalizations codified in the LSC do not make up for this lack of specific evidence.

### B. *The Interim Building Review Board*

■ Although the Life Safety Code does not ensure that safety requirements imposed on RBCO's are tailored to the specific needs and abilities of handicapped residents, the Naperville fire prevention code includes an appeal provision. In theory at least, a well-structured review process could ensure that the provisions of the LSC apply only where they correspond to the needs and abilities of handicapped residents of RBCO's. In this case, however, neither the review process itself, nor the result it produced, satisfied the dictates of the FHAA.

As stated earlier, the Naperville fire prevention code contains the following appeal provision:

> Whenever the Bureau of Fire Prevention shall disapprove an application or refuse to grant a permit applied for, or when it is claimed that the provisions of the Code do not apply or that the true intent and meaning of the Code have been misconstrued or wrongly interpreted, the applicant may appeal from the decision of the Bureau to the Building Review Board.

(Defs.' 12(M), Ex. G, Code § 5–1D–7.) The Naperville Municipal Code states that the Building Review Board "shall consist of nine (9) members," including an engineer or architect, a plumber, an electrician, a construction contractor, and a construction worker. (Pls.' 12(M), Ex. J, Code § 2–4–1.) The Municipal Code includes a "Residence Requirement" for members of the Building Review Board, stating that "[e]ach member shall either be a resident of the City or shall have his principal employment within the City." (*Id.* § 2–4–1(3).)

When the Alliance applied to the Building Review Board for a variation from the fire code, the Naperville Building Review Board had not considered an application for any kind of variance in over ten years. In fact, Naperville did not have an appointed Building Review Board at that time. Instead, Naperville created the "Interim Naperville Building Review Board," alternatively known as the "Interim Building Advisory Board," the "interim committee of the building review board," or the "*ad hoc* Board." The Interim Naperville Building Review Board ("Interim Board") consisted of the Chief of the Naperville Fire Department, the Chief of the Elmhurst Fire Department, the Chief of the Winfield Fire Department, Naperville's Chief Building Official, and Jack Ryan, Executive Director of Little Friends.

It is quite obvious that the composition of the Interim Board did not comport with the requirements for the Building Review Board set forth in the Naperville Municipal Code. The Naperville Municipal Code calls for a board of nine members, but the Interim Board had only five members. The Naperville Municipal Code calls for a board that includes members of several specific professions (including a plumber, an electrician, and a construction worker), but the Interim Board apparently did not include members from each of these professions. The Naperville Municipal Code contains a residence requirement, but it seems unlikely that the Chief of the Elmhurst and Winfield Fire Departments were residents of Naperville.

There are two possible interpretations of this scenario. One interpretation is that Naperville violated its own Municipal Code when it convened the Interim Board to review the Alliance's application for a variance. Defendants recognize this possibility but regard it as inconsequential:

**12.** In violation of Sixth Circuit Rule 24(c), defendants also cite an unpublished disposition in *Comcare, Inc. v. Metropolitan Government of Nashville,* No. 93–6282, 1994 WL 601020 (6th Cir.1994). *Cf. In Re VIII South Michigan Associates,* 167 B.R. 877, 879 (N.D.Ill.1994) (violation of Seventh Circuit Rule 53(B)(2) improper and sanctionable). Even if it were proper to cite this unpublished disposition, the citation would carry little persuasive weight, since the Sixth Circuit did not explain the relevant facts, did not cite a single case, and did not engage in any real analysis of the FHAA.

That the [Interim] Board was ad hoc, rather than sitting, and had five rather than nine members, was of no consequence, since under the Naperville ordinance the Board could operate on a quorum of five, and its function was only to make a non-binding recommendation to the City Council. Plaintiffs [sic] complaint that the [Interim] Board contained non-Naperville citizens is baffling, in light of plaintiffs' assertion that Naperville citizens were prejudiced against the group home. (Defs.' Mem. in Supp. at 10.) This effort to minimize the importance of abiding by legally-established processes in a democratic society barely merits a response. The Naperville Building Review Board has the power to recommend actions that may have a profound impact on the lives of individual citizens of Naperville, such as where citizens will be permitted to live and where they will be permitted to do business. The Municipal Code of Naperville requires that the Building Review Board have a very specific composition—presumably because such a composition encourages a certain diversity of viewpoint, or a certain combination of expertise, or a certain quality of deliberation. That the Building Review Board envisioned in the Municipal Code could operate on a quorum of five does not mean that any group of five people could substitute for that Board. That the Building Review Board envisioned in the Municipal Code makes "only" non-binding recommendations to the City Council does not render its composition irrelevant. Presumably, the City Council relies on the expertise and deliberation of the Building Review Board; otherwise there would be no need for a Building Review Board. Indeed, in this very case, the City Council adopted the findings and recommendations of the Interim Board without changing a word. Thus, defendants' attempt to minimize the importance of the Building Review Board is not only philosophically repugnant but also factually insupportable.

In an effort to escape the problematic conclusion that Naperville violated its own Municipal Code when it convened the Interim Board, defendants argue that the Building Review Board described in the Municipal Code does not review applications for variances from the Life Safety Code. (Defs.' Mem. in Supp. at 10.) However, under the express terms of the Appeal Provision in Naperville's fire prevention code, an applicant may appeal to the Building Review Board if "it is claimed that the provisions of the Code do not apply." (Defs.' 12(M), Ex. G., Code § 5–1D–7.) In this case, plaintiffs argued that the LSC should not apply to them because they were protected by the FHAA, so their application for a variance is clearly covered. Elsewhere, the Naperville Municipal Code specifically states that the Building Review Board will deal with "*any* application for a ruling on, or variation from, the ... fire regulations of the City." (Pls.' 12(M), Ex. J, Code § 2–4–3(1) (emphasis added).) The Code also states that "*[a]ny* person seeking a variance from the provisions of the ... fire regulations of the City may ... make application to the Board for a variation." (*Id.* § 2–4–4 (emphasis added).) In short, the provisions of the Naperville Municipal Code regarding the Building Review Board clearly applied in this case, and the actual composition of the Interim Board clearly violated those provisions.

After holding a public hearing, the Interim Board issued written findings and recommendations, which the City Council adopted verbatim. The Interim Board recommended that the City Council waive certain LSC requirements that would affect the aesthetic value of the home and cause the home to take on the appearance of an institution. However, the Interim Board recommended that the City Council deny the request for a variance from the requirement that the Alliance install a sprinkler system and a fire alarm monitoring system wired into the Naperville Fire Department. In support of the latter recommendation, the Interim Board found that "the Naperville Fire Department properly applied the 1991 Life Safety Code" to 408 Braemer Court, and "[t]he variances requested are a major deviation from the 1991 and 1994 Life Safety Codes, and would compromise the public life and property interests protected under those Codes." Thus, instead of considering the specific needs and abilities of the residents of 408 Braemer Court, the Interim based its conclusions on

the proper application of the generalizations in the LSC, along with a vague reference to "the public life and property interests protected" by the LSC.

Because the composition of the Interim Board violated the Naperville Municipal Code, and because the Interim Board based its recommendations on the generalizations in the LSC rather than the specific needs and abilities of the residents of 408 Braemer Court, the court finds no reason to defer to the judgment of the Interim Board. The court concludes that as applied to plaintiffs in this case the Naperville fire prevention code violates the FHAA.

## IV. REASONABLE ACCOMMODATION

 Even if the Naperville fire prevention code did not violate the FHAA on its face, defendants violated the FHAA by failing to make reasonable accommodations in applying the Code to plaintiffs. Under the FHAA, unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. Section 3604(f)(3)(B). "Under this provision, affirmative steps are required to change rules or practices if [such steps] are necessary to allow a person with a disability an opportunity to live in the community." *Horizon House Developmental Servs., Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 699 (E.D.Pa.1992). Thus, making a reasonable accommodation "means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual." *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 462 n. 25 (D.N.J.1992); *see Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1502 (10th Cir.1995) (quoting *Cherry Hill*); *North Shore–Chicago Rehabilitation Inc. v. Village of Skokie,* 827 F.Supp. 497, 499 (N.D.Ill.1993) (same).

 In order to prevail on a claim that defendants failed to make "reasonable accommodations," plaintiffs must demonstrate two things. First, plaintiff must show that "the desired accommodation will affirmatively enhance a disabled plaintiff's

quality of life by ameliorating the effects of the disability." *Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995). Here, waiving the requirement that the Alliance install a sprinkler system and a fire alarm monitoring system would allow the County Health Department to place five additional mentally ill adults in the home at 408 Braemer Court, including plaintiffs Judy Doe and Chris Doe. It is undisputed that these prospective residents now reside in nursing homes, that their placement in nursing homes is inappropriate, and that moving into the residential home at 408 Braemer Court will help them reintegrate into the community. Therefore, it seems clear that the accommodation sought will enhance the quality of life of Judy Doe and Chris Doe, and ameliorate the effects of their mental illnesses.

Second, plaintiff must show that the benefit to plaintiff outweighs the cost to defendant. *Id.* at 431, 428–29. Here, it would cost defendants nothing to waive the requirements at issue. The accommodation requested amounts to nothing more that a request for non-enforcement of a rule, and Naperville "has not articulated any hardship (administrative or financial) resulting from non-enforcement." *Proviso Ass'n of Retarded Citizens v. Village of Westchester,* Report and Recommendation of Magistrate Judge Martin C. Ashman at 15, adopted by district court, 914 F.Supp. 1555, 1562 (N.D.Ill.1996). Similarly, Naperville has not offered any evidence that waiving the requirement in this case will threaten the safety of the residents of 408 Braemer Court. *See id.* at 1563 (reaching same conclusion on similar facts). Thus, the undisputed benefits to Judy Doe and Chris Doe clearly outweigh any costs to the City of Naperville.

## V. RULING AND RELIEF

The Naperville fire prevention code discriminates on its face against handicapped persons, and the defendants in this case fail to justify that discrimination in terms of the individual needs and abilities of the handicapped persons affected. Even if the Naperville fire prevention code did not discriminate on its face, defendants have failed to make a reasonable accommodation for plaintiffs as

required under the FHAA. Therefore, as applied to the plaintiffs in this case, the Naperville fire prevention code violates the Fair Housing Amendments Act of 1988. Plaintiffs motion for summary judgment as to liability is granted. Defendants are permanently enjoined from enforcing against plaintiffs the two provisions of the Naperville fire prevention code still at issue in this case: the sprinkler system and the fire alarm monitoring system.

Defendants move for dismissal or summary judgment, arguing that their actions did not violate the FHAA. For reasons stated above, the court rejects defendants' argument and denies defendants' motion.[13]

### Conclusion

For the reasons set forth above, plaintiffs' motion for summary judgment is granted. Defendants' motion for dismissal or summary judgment is denied. Defendants are permanently enjoined from enforcing against plaintiffs the two provisions of the Naperville fire prevention code still at issue in this case: the sprinkler system and the fire alarm monitoring system. The parties are instructed to engage in full-scale settlement discussions regarding damages before their next court date.

---

**13.** Defendants also argue that plaintiffs' lack standing to enjoin an amendment to the Naperville zoning ordinance. (Defs.' Mot. at 14; Defs.' Mem. in Supp. at 15.) Because plaintiffs have agreed to dismiss those claims without prejudice (Pls.' Reply at 14), the issue is moot and the court declines to address it.