**COMMUNITY HOUSING TRUST, et al., Plaintiffs,**

v.

**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS, et al., Defendants.**

**No. CIV.A. 01–02120(HHK).**

United States District Court, District of Columbia.

April 16, 2003.

Reed N. Colfax, Washington's Lawyers' Committee for Civil Rights, Washington, DC, for plaintiffs.

Mark D. Back, Andrew J. Saindon, Office of Corp. Counsel, D.C., Washington, DC, for Dept. of Consumer and Regulatory Affairs, Michael Johnson, Office of Tax and Revenue, Officer of Chief Financial Officer, Olutoye Bell, defendants.

William Francis Sheehan, Shea & Gardner, Washington, DC, for David L. Bazelon Center for Mental Health Law, National Law Center on Homelessness and Poverty, Amer. Ass'n of People with Disabilities, Washington legal Clinic for the Homeless, Nat. Ass'n of Protection and Advocacy Systems, Whitman-Walker Clinic Legal Services, University Legal Services, amicus.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs, Community Council for the Homeless at Friendship Place ("CCH") and Community Housing Trust, bring this action pursuant to 42 U.S.C. § 3604(f)(1) and § 3604(f)(2) of the Fair Housing Act, as amended by the Fair Housing Amendments Act of 1988. Plaintiffs contend that defendants, the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), the District of Columbia Office of the Chief Financial Officer, the District of Columbia Office of Tax and Revenue, and acting Zoning Administrator for the District of Columbia, Olutoye Bello (collectively, the "District"), violated the Fair Housing Act by (1) enforcing District of Columbia zoning regulations that dis-

criminate against persons with disabilities, and (2) interpreting District of Columbia zoning regulations to place burdens on plaintiffs because they operate a home for persons with disabilities.[1] Defendants contest plaintiffs' claims and further allege that this case is nonjusticiable because the District's recent voluntary conduct has rendered this controversy moot.

Before this court are defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment, defendants' supplemental motion for summary judgment, and plaintiffs' cross-motion for summary judgment as to liability only. Upon consideration of these submissions and the summary-judgment record,[2] the court concludes that defendants' motion for summary judgment must be granted in part and denied in part, and plaintiffs' motion for summary judgment as to liability must also be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Plaintiffs, Community Housing Trust and Community Council for the Homeless at Friendship Place, are two non-profit organizations dedicated to serving Washington, D.C. residents who are, have been, or are at risk of becoming, homeless. Plaintiffs engage in a number of activities in support of their mission, including helping the homeless to obtain public benefits, providing health care services and mental counseling, developing and managing housing, educating the community, and advocating for policies to combat homelessness.

On March 8, 2001, in furtherance of their mission to obtain housing for the homeless, plaintiffs purchased a home at 5643 Western Avenue, located in a residential district within the Northwest quadrant of the District of Columbia. This residence was to house six persons: five men with mental disabilities (specifically, paranoid schizophrenia and bi-polar disorder), and one resident manager.[3] Under plaintiffs' plan, the residents were to live with one another as a "family." They were to share a kitchen, dining room, living room, recreational room, and garden, share responsibility for the day-to-day upkeep of the property, and come and go freely. The house was to be named "Zeke's House."

Problems arose, however, because upon learning that Zeke's House would be occupied by men with mental disabilities, a number of neighbors raised voices of concern. Less than two weeks after plaintiffs purchased the home, neighbors had gathered fifty-two signatures on a petition op-

---

1. In recent filings, the parties refer to Bello as "the *former* acting Zoning Administrator." *See, e.g.,* Defs.' Supp. Mot. for Summ. J. at 1 n. 1 (emphasis added). However, as the court has not been informed of any change in Bello's status, the court will proceed under the assumption that Bello is the current acting Zoning Administrator for the District of Columbia.

2. The court has also considered the views of the *amicus curiae:* the Judge David L. Bazelon Center for Mental Health Law, the National Law Center for Homelessness and Poverty, the American Association of People with Disabilities, the Washington Legal Clinic for the Homeless, the National Association of Protection and Advocacy Systems, the Whitman-Walker Clinic, and University Legal Services.

3. Prospective Zeke's House residents had to fulfill the following eligibility requirements in order to reside in the home: have a major mental disability, be known to CCH staff, have been clean and sober for the preceding six months, agree to work with a case manager, have not engaged in any violent behavior within the preceding two years, and express a willingness to live in a community household. Am. Compl. ¶ 5.

posing Zeke's House. The petition also demanded that Michael Johnson, the then District of Columbia Zoning Administrator, determine whether plaintiffs' proposed use of the property was permitted, and if so, what restrictions and requirements would apply. Pls.' Ex. 18 (petition).[4] In addition, neighbors made Zeke's House the first item on the agenda of the next Advisory Neighborhood Commission ("ANC")–3G meeting. At that March 26, 2001, meeting, neighbors expressed their fears and anxieties about living in close proximity to Zeke's House's mentally ill residents.

Two days after the ANC–3G meeting, ANC–3G representative Joseph Bishop sent a letter to Zoning Administrator Johnson. In this letter, Bishop requested a determination regarding whether the residents of Zeke's house would constitute a "family" or a "community-based residential facility" ("CBRF"), under District of Columbia regulations and, if a CBRF, what restrictions would apply.[5] This determination was quite important because under D.C. law, a family can locate as a matter of right in any residential district without a certificate of occupancy, but a CBRF can not. D.C. Mun. Regs. tit. 11, § 199.1 (1995), as amended.

Upon receiving Bishop's request, Zoning Administrator Johnson opened an investigation. During the course of this investigation, plaintiffs argued that the Zeke's House residents would constitute a "family" under the District's definition of the term. Under the District's zoning regulations, a "family" is defined as "one (1) or more persons related by blood, marriage, or adoption, or not more than six (6) persons who are not so related, including foster children, living together as a single house-keeping unit, using certain rooms and housekeeping facilities in common ...." D.C. Mun. Regs. tit. 11, § 199.1. Plaintiffs maintained that because Zeke's House was a home to be occupied by six unrelated persons living together, it was a "family" residence and entitled to the privileges associated therewith.

The neighbors and the ANC–3G took a different view. They argued that the residence was, not a family residence, but instead a CBRF. Under D.C. law, a CBRF is defined as "a residential facility for persons who have a common need for treatment, rehabilitation, assistance, or supervision in their daily living." *Id.* Unlike families, CBRFs must obtain a "certificate of occupancy"[6] in order to inhabit a dwelling, pursuant to D.C. Mun. Regs. Tit. 11, § 3202.1. *See also* D.C. Mun. Regs. tit. 11 § 3203.1 ("no person shall use any structure, land, or part of any structure or land for any purpose other than a one-family

4. Olutoye Bello, a named defendant to this action, replaced Michael Johnson as the District of Columbia Zoning Administrator on October 1, 2002.

5. The letter specifically asked:
 Would Zeke's House be prohibited if it is construed to be a community residential facility and is too close to a similar facility? What are the restrictions regarding two-community-based residential facilities located in the same square? Are there additional restrictions if the residents of Zeke's House are substance abusers?
 Pls.' Ex. 19 (Bishop Ltr. to Johnson, March 28, 2001).

6. To obtain a certificate of occupancy for premises not in excess of 5,000 square feet, one must submit to a series of inspections, pay a $25.00 application fee and a $32.00 permit fee, and supply the following categories of information: name, address, and corporate structure of the proposed business; the proposed use of the premises; prior use of premises; proposed occupancy load; square feet occupied; and floors to be occupied. Pls.' Ex. 37 (Application for Certificate of Occupancy); Pls.' Ex. 40 at 101 (Dep. of Bello). These requirements will be explored in more detail, *infra.*

dwelling until a certificate of occupancy has been issued ..."). The neighbors' letters also described their fears of having Zeke's House's mentally disabled residents in their neighborhood and suggested that the residents would be inadequately supervised, abuse illegal substances, and engage in violent behavior. The public also weighed in, and editorials and articles opposing and supporting Zeke's House appeared in area newspapers. The Mayor also became involved in the controversy.

On September 6, 2001, at the conclusion of his six-month investigation, Zoning Administrator Johnson determined that Zeke's House would indeed constitute a CBRF-and would thus require a certificate of occupancy.[7] Pls.' Ex. 4 (Zoning Administrator Opinion).

There are seven categories of CBRF's under District of Columbia law. These include: (1) adult rehabilitation home; (2) community residence facility; (3) emergency shelter; (4) health care facility; (5) substance abusers home; (6) youth rehabilitation home; and (7) youth residential care home. D.C. Mun. Regs. tit. 11, § 199.1. The Zoning Administrator initially provided that Zeke's House constituted either an emergency shelter or a community residence facility ("CRF"). Pls.' Ex. 4 (*Zoning Administrator Opinion*). An "emergency shelter," defined as "temporary housing," can locate in any residential zone as a matter of right, as long as it is

occupied by only four residents. D.C. Mun. Regs. tit. 22, § 3099.1. Because Zeke's House was to provide permanent, not temporary, housing and was to house six persons, not four, it did not fit neatly into the definition of an "emergency shelter." Thus, the Zoning Administrator concluded that the home likely constituted a CRF, pursuant to D.C. Mun. Regs. tit. 11, § 199.1. A CRF is defined as:

> a facility providing safe, hygienic sheltered living arrangements for one (1) or more individuals aged eighteen (18) years or older ... who are ambulatory and able to perform the activities of daily living with minimal assistance. The definition includes ... group homes for mentally retarded persons, which provide a sheltered living arrangement for persons who desire or require supervision or assistance within a protective environment because of physical, mental, familial, or social circumstances, or mental retardation.

D.C. Mun. Regs. tit. 22, § 3099.1.

Plaintiffs contend that this preliminary characterization presented yet another hurdle. They assert that under District of Columbia law, a CRF must be licensed under the Community Residence Facilities Regulations. *See* D.C. Mun. Regs. Tit. 11, § 119.1. Pursuant to these regulations, Zeke's House would best qualify as a "CRF for mentally ill persons." However,

---

**7.** It is important to note that the Zoning Administrator had discretion concerning Zeke's House's classification. The Zoning Commission has stated that a home with up to six unrelated persons with common need of treatment, rehabilitation, assistance, or supervision in their daily living can still be classified as a family. Pls.' Ex. 7 at 7 (Zoning Commission Order 347, July 9, 1981). The question of whether the Zoning Administrator, in the exercise of his discretion, was at all influenced by the neighbor's opposition to Zeke's House will be explored *infra*. Plaintiffs assert that

the neighbors' opposition played a role in the Zoning Administrator's actions; defendants deny that the neighbors had "undue" influence. *See* Def.'s Mot. for Summ. J. at 11. In addition, at this juncture, the court must note that defendants now take the position that the Zoning Administrator's decision was merely "preliminary." Defs.' Mot. for Summ. J. at 18, 30. However, given that a $500 fine was levied on the basis of this determination, the court cannot fully accept defendants' categorization.

such a CRF is defined as a facility for adults with "a principal diagnosis of mental illness" who "require twenty-four hour (24 hr.) on site supervision, personal assistance, lodging and meals . . . ." D.C. Mun. Regs. Tit. 22 § 3800.2. Because Zeke's House residents are not given, and indeed do not require, twenty-four-hour supervision,[8] Zeke's House did not satisfy the requirements to obtain a license as a CRF for "mentally ill persons." Without such a license, plaintiffs contend that Zeke's House could not be in legal status, and as such, could not obtain a certificate of occupancy. Thus, according to plaintiffs, Zeke's House was unable to "meet the requirements for a certificate of occupancy without a fundamental alteration of their supportive housing model." Pls.' Opp. to Summ. J. at 3, 32. *See* Pls.' Ex. 10 at 34 (Dep. of Coonrod) (providing that the entire purpose of Zeke's House is to allow the men to "live independently, with support that is similar to support in other households").

Defendants disagree, evincing a fundamentally different view of what the certificate of occupancy requirement entails. This disagreement, as explored below, figures prominently in this controversy.

Defendants maintain that the certificate of occupancy requirement is a mere formality and that, had plaintiffs applied for a certificate of occupancy, one would have been granted forthwith. Defendants cite to the deposition testimony of Johnson, who, when asked "what would be the re-quirements for [obtaining] a certificate of occupancy" replied "simply fill out the application and if [sic] would have been granted. It would have been a perfunctory process." Defs.' Ex. 13 at 138–39 (Dep. of Johnson); *see also* Defs.' Ex 14 at 100 (Dep. of Bello) ("Q: what would be the process for the owners of Zeek's [sic] House to get a certificate of occupancy? A: By simply applying for it and go through the inspection process.").

In late September 2001, a few weeks after the Zoning Administrator rendered his decision classifying Zeke's House as a CBRF, Zeke's House's six residents-five formerly homeless men with mental disabilities and a resident manager-moved in to their home on 5643 Western Avenue. They did not have a certificate of occupancy; indeed, they had not applied for one. Within three days, Zoning Administrator Johnson personally arrived at the house, concluded that the home was occupied by a non-family without a certificate of occupancy, and issued a Notice of Infraction. The Notice cited a violation of D.C.Code 52.207 and D.C. Mun. Regs. tit. 11, § 3203.1 (2000), and levied a $500 fine.[9] On January 15, 2002, moreover, the Office of Tax and Revenue for the District of Columbia declared Zeke's House to be a rooming house under the zoning laws and denied plaintiffs' request for a real-property tax exemption, unless and until plaintiffs obtained this certificate.[10] Pls.' Ex. 8 (Branham Ltr. to Coonrod, Jan. 15, 2002).

---

**8.** The District of Columbia Department of Mental Health has concluded that "Zeke's House does not require a license." Pls.' Ex. 4 (Knisley Ltr. to Shea, Sept. 12, 2001).

**9.** D.C. Mun. Regs. tit. 11 § 3203.1 provides: "no person shall use any structure, land, or part of any structure or land for any purpose other than a one-family dwelling until a certificate of occupancy has been issued . . . ."

**10.** Rooming houses, while not CBRF's, must also have a certificate of occupancy to operate legally. A "rooming house" is defined as: [A] building or part of a building that provides sleeping accommodations for three (3) or more persons who are not members of the immediate family of the resident operator or manager, and in which accommodations are not under the exclusive control of the occupants. A rooming house provides accommodations on a monthly or

On October 10, 2001, shortly after the Notice of Infraction was issued, the DCRA suspended enforcement of the Notice without prejudice. The citation's enforcement was suspended for two reasons. First, the DCRA found that the property owners had "met the substance of the requirements for health and safety at Zeke's House as contemplated in the certificate of occupancy guidelines." Defs.' Ex. 8 (Love Ltr. to Shea, Oct. 9, 2001). Second, the Mayor stated an intention to convene a task force to review all regulations applicable to group homes. The Notice of Infraction was therefore held in abeyance pending the outcome of the Mayor's task force. *Id.*

The day after this suspension was issued, on October 11, 2001, plaintiffs filed the instant action, seeking a declaratory judgment, preliminary and permanent injunctive relief, and compensatory and punitive damages.[11] Thereafter, plaintiffs filed an amended complaint, and defendants filed their motion for judgment on the pleadings, or, in the alternative, for summary judgment, and plaintiffs filed their cross-motion for partial summary judgment.

Subsequently, by letter dated December 6, 2002, defendant DCRA seemed to back down. The DCRA informed plaintiff CCH that, pursuant to a change in District policies and a "pending revision" of Title 11 of the D.C. Municipal Regulations, Zeke's

House was exempt from the certificate of occupancy requirement. Defs.' Supp. Ex. A (Kelly Ltr. to Shea, Dec. 6, 2002). A few weeks later, defendant Office of Tax and Revenue informed plaintiff CCH that, as a result of the DCRA's decision not to require a certificate of occupancy, Zeke's House was entitled to an exemption from real-property taxation, effective April 1, 2001. Defs.' Supp. Ex. B (Branham Ltr. to Coonrod, Dec. 31, 2002). Moreover, in December 2001, the Office of Tax and Revenue amended its regulations to specifically allow tax exemptions for programs that provide housing and supportive services to persons with disabilities. Notice of Final Rulemaking, 48 D.C.Reg. 11705, 11708–09 (Dec. 28, 2001).

Defendants contend that these recent events moot this controversy, and at a status conference on January 10, 2003, this court heard defendants' argument to that effect. Based upon defendants' claims, the court allowed further briefing on the question.[12] Defendants subsequently filed a supplemental motion for summary judgment, which plaintiffs oppose.[13]

## B. Claims and Defenses

Plaintiffs bring a facial and as-applied challenge to the District's zoning regulations, claiming that the District's zoning scheme and the Zoning Administrator's decision to classify Zeke's House as a

---

longer basis. The term 'rooming house' shall not be interpreted to include an establishment known as, or defined in this title as, a hotel, motel, inn, bed and breakfast, private club, tourist home, guest house, or other transient accommodation.
D.C. Mun. Regs. tit. 11, § 199.1. Rooming houses are not permitted at all in the R–2 district where Zeke's House is situated. D.C. Mun. Regs. tit. 11, § 300.3.

**11.** While both the original and the amended complaints demand preliminary injunctive relief, plaintiffs have not pursued such relief.

**12.** The court gave defendants permission to file a supplemental motion for summary judgment for the limited purpose of determining whether recent events rendered this controversy moot. Accordingly, the court will not consider defendants' other, unrelated arguments, raised for the first time in their supplemental motion for summary judgment.

**13.** Defendants opted not to file a reply. *See* Praecipe, docketed March 12, 2003.

CBRF, frustrated the missions of their respective organizations, thwarted their plans to develop more homes, precipitated a reduction in donations, and drained their limited resources. Defendants refute plaintiffs' allegations and further contend that: (1) actions taken in December 2002 moot this controversy, and (2) some defendants must be dismissed because they are *non sui juris.* To these claims the court now turns.

## II. ANALYSIS

### A. Legal Standard

Because both parties have presented material outside the pleadings, and the court has relied upon such material, the parties' motions will be treated as motions for summary judgment.

Under Fed.R.Civ.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving par-

ty is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. *Non Sui Juris*

Defendants first claim that certain defendants named in this suit are *non sui juris.* Specifically, defendants argue that the District of Columbia Department of Consumer and Regulatory Affairs, the District of Columbia Office of the Chief Financial Officer, and the District of Columbia Office of Tax and Revenue, are not amenable to suit. Plaintiffs do not contest this allegation.

■ The law is clear that "agencies and departments within the District of Columbia government are not suable as separate entities." *Does I through III v. District of Columbia,* 238 F.Supp.2d 212, 222 (D.D.C. 2002) (quoting *Gales v. District of Columbia,* 47 F.Supp.2d 43, 48 (D.D.C.1999)) (in turn citing *Fields v. District of Columbia Dep't of Corr.,* 789 F.Supp. 20, 22 (D.D.C. 1992)); *see also Arnold v. Moore,* 980 F.Supp. 28, 33 (D.D.C.1997) ("[g]overnmental agencies of the District of Columbia are not suable entities") (citing *Roberson v. District of Columbia Bd. of Higher Educ.,* 359 A.2d 28, 31 n. 4 (D.C.1976); *Miller v. Spencer,* 330 A.2d 250, 251 n. 1 (D.C.1974)); *Jenkins v. District of Columbia,* 1996 WL 440551, *1 n. 2 (D.D.C.1996). Accordingly, plaintiffs' charges against the Department of Consumer and Regulatory Affairs, the Office of the Chief Financial Officer, and the Office of Tax and Revenue shall be dismissed.[14]

---

**14.** Plaintiffs' claims against the District of Co- lumbia Office of Tax and Revenue will not be

The acting Zoning Administrator for the District of Columbia, Olutoye Bello, sued in his official capacity, is a proper defendant, and the suit against Bello shall be treated as a suit against the District of Columbia. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *accord Arnold v. Moore,* 980 F.Supp. 28, 36 (D.D.C.1997) ("It is well settled that if the plaintiff is suing the defendants in their official capacities, the suit is to be treated as a suit against the District of Columbia."). Thus, this suit may proceed against defendant Bello.

## C. Mootness Doctrine

Moving to defendants' next argument, in defendants' supplemental motion for summary judgment, defendants contend that they are entitled to summary judgment on all claims because plaintiffs' action is now moot. Defendants' claim is without merit.

 The mootness doctrine limits Article III courts to deciding "actual, ongoing controversies." *Pharmachemie B.V. v. Barr Labs., Inc.,* 276 F.3d 627, 631 (D.C.Cir.2002) (quoting *Clarke v. United States,* 915 F.2d 699, 700–01 (D.C.Cir. 1990)) (in turn quoting *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). A case is moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 575

(D.C.Cir.1990); *accord Pub. Util. Comm'n of the State of California v. FERC,* 236 F.3d 708, 714 (D.C.Cir.2001).

 It is well settled, however, that voluntary cessation of illegal conduct does not, by itself, render an action moot unless "there is no reasonable expectation that the conduct will recur *and* (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Arizona Pub. Serv. Co. v. EPA,* 211 F.3d 1280, 1296 (D.C.Cir.2000) (emphasis added) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)); *see also Northeastern Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville,* 508 U.S. 656, 662, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993); *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Reeve Aleutian Airways Inc. v. United States,* 889 F.2d 1139, 1142–43 (D.C.Cir.1989). If a defendant contends that her voluntary conduct has mooted the controversy, she bears the "heavy" burden of showing the above requirements have been met. *Id.* at 1143 ("The burden lies with the moving party, and it is a heavy one.").

Here, defendants argue that the controversy is moot because the District has determined that Zeke's House does not

---

discussed separately herein. The court declines to entertain these claims, due to the Office's *non sui juris* status and because the court finds that the Office's amendment to its regulations, to specifically allow tax exemptions for programs that provide housing and supportive services to persons with disabilities, likely renders this claim moot. *See* Notice of Final Rulemaking, 48 D.C.Reg. 11705, 11708–09 (Dec. 28, 2001). *See generally Massachusetts v. Oakes,* 491 U.S. 576, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989); *Kentucky*

*Right to Life, Inc. v. Terry,* 108 F.3d 637, 645 (6th Cir.1997) (finding that the plaintiff's challenge was moot because the Kentucky General Assembly had amended the offending legislative scheme); *Stephenson v. Davenport Cmty. Sch. Dist.,* 110 F.3d 1303, 1311–12 (8th Cir.1997) (ruling that a high school student's challenge to school district's regulation prohibiting gang symbols was moot, where school had amended its regulation to redefine what constituted gang symbols and activity).

require a certificate of occupancy and has granted plaintiffs' requested real-property tax exemption. Defendants further contend that plaintiffs have suffered no cognizable injury from the District's previous policies because: (1) the Zeke's House residents occupied the home according to schedule, and (2) the District took no permanent action against plaintiffs or the Zeke's House residents. In this case, plaintiffs present two claims: (1) that the District maintains a facially discriminatory zoning scheme, and (2) that defendants' specific decision to require Zeke's House to obtain a certificate of occupancy violated the FHAA. The court will consider the justiciability of each claim in turn.

■ Defendants' argument that recent events have rendered plaintiffs' facial challenge moot merits only a brief discussion. Quite simply, defendants have presented no evidence to suggest that plaintiffs' facial challenge to Title 11 of the D.C. Municipal Regulations is moot. *Arizona Pub. Serv. Co.*, 211 F.3d at 1296. Defendants have not altered Title 11, and they have made no firm promise to do so.[15] Without such action, there is no basis upon which the court may conclude that plaintiffs' facial challenge to defendants' regulations is nonjusticiable. *See generally Payne Enterprises, Inc. v. United States*, 837 F.2d 486 (D.C.Cir.1988); *Better Gov't Ass'n. v. Dep't of State*, 780 F.2d 86 (D.C.Cir.1986).

■ Plaintiffs' as-applied challenge presents a closer question. Indeed, it is undisputed that the Zeke's House residents: (1) occupied the home according to schedule, (2) never had to pay the $500 fine, and (3) were ultimately granted a real-property tax exemption. Accordingly, one may argue that plaintiffs suffered no cognizable injury as a result of defendants' alleged violation.

■ While such an argument has appeal at first blush, the court finds that it ultimately underestimates the "heavy" burden imposed on defendants in asserting mootness. In order to demonstrate that plaintiffs' as-applied challenge is moot, defendants must not only show that there is "no reasonable expectation that the conduct will recur," they must also show that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *Arizona Pub. Serv. Co.*, 211 F.3d at 1296, keeping in mind that "so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case." *Buckhannon Bd. & Care Home Inc. v. West Virginia Dep't of Health*, 532 U.S. 598, 608–09, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

In this case, plaintiffs have expressed some interest in establishing more homes like Zeke's House and Veronica's House (their home for women), and defendants have not shown that the zoning problems that plagued Zeke's House will not plague

---

**15.** The court notes that the December 6, 2002, letter from the Zoning Administrator to plaintiffs suggests that a revision to the challenged Zoning Regulations is "pending." Defs.' Supp. Ex. A (Kelly Ltr. to Shea, Dec. 6, 2002). In addition, in defendants' supplemental brief for summary judgment, defendants content that "the District ... will soon change its regulations." Defs.' Supp. Mot. for Summ. J. at 10. However, despite plaintiffs' requests for further information concerning this allegedly upcoming revision, no information regarding the nature or procedural status of any "pending revision to Title 11" has been provided to plaintiffs or to this court. Because defendants have provided no information in support of their claim, either that a revision is "pending," or that the District "will soon change its regulations," the court cannot find that defendants are entitled to summary judgment on this basis. As plaintiffs correctly note, the "vague possibility of an unspecified change" is simply not enough to moot a controversy. Pls.' Opp. to Supp. Mot. for Summ. J. at 9.

future establishments.[16] Thus, defendants have not shown that the alleged violation will not recur.

Moreover, in this case, plaintiffs contend that defendants' actions caused, *inter alia:* (1) a loss of charitable donations, and (2) a frustration of their respective missions. *See* Am. Compl. ¶ 52. *Cf., Samaritan Inns v. District of Columbia,* 114 F.3d 1227, 1234 (1997) (noting that a party may recover for a loss of charitable donations, provided the damages are proved with requisite particularity); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (providing that frustration of an organization's mission constitutes a cognizable injury). Thus, plaintiffs contend, and have presented evidence to show, that they have suffered adverse effects brought about by defendants' actions, not remedied by defendants' subsequent decision to suspend the Notice of Infraction or grant the real-property tax exemption. *See* Pls.' Ex. 5 at 28–32, 44 (Dep. of Coonrod) (estimating that the controversy has cost Community Housing Trust $55,000 in lost donations and providing that at least ten people told her that they would not donate to the organization because of the instant dispute).

While the lines are somewhat murky, the court finds that plaintiffs' injuries are akin to those suffered by the plaintiffs in *Reeve Aleutian Airways,* 889 F.2d 1139 (D.C.Cir.1989), *Am. Fed'n of Gov't Employees v. Reagan,* 870 F.2d 723, 726 (D.C.Cir.1989), and *Doe v. United States Air Force,* 812 F.2d 738, 740–41 (D.C.Cir. 1987), such that the court may consider this controversy, notwithstanding defendants' recent change of heart. The court finds, in short, that plaintiffs' injuries to their respective missions and coffers are concrete, traceable to defendants' conduct, and curable by the monetary relief demanded. *Cf. Penthouse Int'l Ltd. v. Meese,* 939 F.2d 1011, 1019 (D.C.Cir.1991). Thus, plaintiffs' facial and as-applied challenges are justiciable and may proceed; consequently, defendants' supplemental motion for summary judgment is denied.

## C. The Fair Housing Act

The court may now turn to the question at the heart of this controversy: does the District of Columbia's policy violate the Fair Housing Act?

■ Congress passed the federal Fair Housing Act, ("FHA") as Title VIII of the Civil Rights Act in 1968 to prohibit housing discrimination on the basis of, *inter alia,* race, gender, and national origin. In 1988, the Act was amended to extend coverage to persons with mental disabilities, among others. *See* The Fair Housing Amendments Act ("FHAA") of 1988, Pub.L. No. 100–430, 102 Stat. 1619, *codified at* 42 U.S.C. § 3601, *et seq.* Traditionally, courts have broadly interpreted the FHA, so as to fully effectuate Congress' remedial purpose. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372–74, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). The Supreme Court has held that the FHAA should be afforded the same generous construction as the original Act. *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 731, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995); *see also Samaritan Inns, Inc. v. District of Columbia,* 114

---

**16.** In so finding, the court notes that while plaintiffs' submissions to this court express a generalized desire to open another home akin to Zeke's House sometime in the future, in her deposition, Claudia Coonrod, former Executive Director of Community Housing Trust, stated that plaintiffs do not have any concrete plans to do so. Defs.' Ex. 12 at 18 (Dep. of Coonrod).

F.3d 1227, 1233 (D.C.Cir.1997). As interpreted, then, the FHAA is "a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen,* 54 F.3d 425, 428 (7th Cir.1995). *See also City of Edmonds v. Washington State Bldg. Code Council,* 18 F.3d 802, 806 (9th Cir. 1994), *aff'd, City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995).

■ Plaintiffs bring this claim pursuant to 42 U.S.C. § 3604(f)(1) and (2). These provisions make it unlawful:

(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of -

(A) that buyer or renter

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; [or]

(C) any person associated with that buyer or renter; or

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of a handicap of [any person listed in (A) through (C) above].

42 U.S.C. § 3604(f)(1) and (2). Under these provisions, "it [is] unlawful to discriminate against a person based on handicap with respect to housing." *Horizon House Dev. Services v. Township of Upper Southampton,* 804 F.Supp. 683, 693 (E.D.Pa.1992) *aff'd mem.,* 995 F.2d 217 (3d Cir.1993). "A local government or governmental entity using zoning powers in a discriminatory manner violates the FHAA . . . ." *Tsombanidis v. City of West Haven,* 129 F.Supp.2d 136 (D.Conn.2001) (citing

*Robinson v. City of Friendswood,* 890 F.Supp. 616, 622 (S.D.Tex.1995); *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 49 (2d Cir.1997)).

Before delving into the crux of this controversy, the court must address two preliminary questions. The court must determine whether the mentally disabled residents of Zeke's House are "handicapped," as defined by the FHAA, and if so, whether plaintiffs have standing to assert the rights of those residents. Defendants "assume" this to be the case, but explicitly refuse to concede the point. *See* Defs.' Mot. for Summ. J. at 6 n. 3.

■ Upon careful consideration, the court finds that the mentally disabled residents of Zeke's House are "handicapped" within the meaning of the FHAA.[17] The court further finds that plaintiffs have standing under § 3604(f)(1)(B) to assert the rights of Zeke's House's mentally disabled residents. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (holding that persons who have suffered an injury as a result of discrimination against others have standing under the FHA); *Spann v. Colonial Village, Inc.,* 899 F.2d 24 (D.C.Cir.1990).

**1. The Zoning Regulations for the District of Columbia Facially Discriminate on the Basis of Disability**

As explained above, under D.C. law, property owners who maintain a CBRF, that is, "a residential facility for persons who have a common need for treatment, rehabilitation, assistance, or supervision in their daily living," must obtain a certificate of occupancy, while those who maintain

---

**17.** Under the FHAA, a person is "handicapped" if she has "a physical or mental impairment which substantially limits one or more of [her] major life activities," or if she has "a record of having such an impairment" or is "regarded as having such an impairment." 42 U.S.C. § 3602(h).

units housing "families" need not. D.C. Mun. Regs. tit. 11, § 199.1. Plaintiffs allege, therefore, that D.C. law facially discriminates on the basis of disability.

■ "A plaintiff who challenges a law that 'facially single[s] out the handicapped and appl[ies] different rules to them' states a claim for disparate treatment." *Alliance for the Mentally Ill v. City of Naperville*, 923 F.Supp. 1057, 1069 (N.D.Ill.1996) (quoting *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir.1995)). To make out a disparate treatment claim, plaintiffs must show that the District's ordinance subjects a protected group, here, the mentally disabled, to differential, *i.e.*, discriminatory, treatment. *Bangerter*, 46 F.3d at 1501.

Plaintiffs rest their disparate treatment claim on the fact that two District of Columbia homes, both housing six or fewer unrelated persons, are classified differently for zoning purposes based upon the residents' "need for *treatment, rehabilitation, assistance, or supervision* in their daily living." D.C. Mun. Regs. tit. 11, § 199.1 (emphasis added). Plaintiffs reason that, when residents' "common need for treatment, rehabilitation, assistance, or supervision in their daily living" is a result of their disability, the classification of the home as a CBRF, and the resulting certificate of occupancy requirement, is based upon that protected characteristic. This, according to plaintiffs, violates the FHAA. Put simply, according to plaintiffs, six college students or six young professionals may cohabitate without submitting a certificate of occupancy, but six people who need treatment, assistance, or supervision, are not so entitled.

Defendants appear to concede this point. *See* Pls.' Ex. 9 at 69 (Bello Dep.) (conceding that people with disabilities are treated differently under the zoning regulations). Nevertheless, the court shall fully analyze plaintiffs' position. Upon careful analysis, the court find that the language in the District's ordinance, which classifies persons based upon their "common need for treatment, rehabilitation, assistance, or supervision in their daily living," does, in fact, apply different standards to persons on the basis of their disability. The fact that the ordinance's language does not make the distinction outright is irrelevant. *See Children's Alliance v. City of Bellevue*, 950 F.Supp. 1491, 1496 (W.D.Wa.1997); *Alliance for the Mentally Ill*, 923 F.Supp. at 1071 ("It is true that the [provisions at issue] apply to buildings that provide personal care services, rather than buildings that house handicapped persons. However, this is a distinction without a difference, since individuals who need personal care services are typically handicapped."); *Horizon House*, 804 F.Supp. at 687–90 (enjoining the enforcement of an ordinance that applied to facilities where the residents needed "permanent care" or "professional supervision" because "the individuals singled out for disparate treatment are those who are unable to live on their own, who, in the language of the Fair Housing Act are 'handicapped'"). It is similarly irrelevant that the ordinance "may incidentally catch within its net some unrelated groups of people without handicaps, such as juveniles or ex-criminal offenders." *Horizon House*, 804 F.Supp. at 694; *accord Alliance for the Mentally Ill*, 923 F.Supp. at 1070.

Defendants, in rebuttal, seem to concede that the ordinance applies different standards to persons on the basis of disability, and they seem to acknowledge that, in theory, a municipality may violate the FHAA by applying different standards to persons on this basis. Defendants maintain, however, that requiring disabled residents to submit to a special procedure does not violate the FHAA, as long as the procedure is neither protracted nor "undu-

ly burdensome." Def.'s Mot. for Summ. J. at 31. Accordingly, defendants' primary defense is that the easy-to-satisfy certificate of occupancy requirement is simply not onerous enough to rise to the level of unlawful discrimination under the FHAA.

The question as framed by the parties, then, does not turn on whether disabled persons must clear certain hurdles under the D.C. zoning scheme *because* of their disability. Defendants apparently concede that they do-a conclusion with which the court agrees.[18] Rather, the controversy turns on whether the special hurdle imposed on the disabled here (i.e., the certification requirement) is burdensome enough to violate the FHAA.

### a. The Burden Imposed by the Certificate of Occupancy

According to defendants, the certificate of occupancy requirement does not implicate the FHAA because it imposes nothing more than a minimal burden for a legitimate purpose. Defs.' Mot. for Summ. J. at 31 (arguing that the FHAA does not "insulate the owners of group homes for the disabled 'from legitimate inquiries designed to enable local authorities to make informed official decisions on zoning issues' ") (quoting *Oxford House–C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir.1996)). Plaintiffs fundamentally disagree, arguing that the certificate of occupancy requirement imposes a *substantial* burden on disabled residents. In the alternative, plaintiffs contend that the imposition of even a minimally onerous zoning requirement on the basis of disability violates the FHAA.

The parties' different assessment of the hurdle posed by the certificate of occupancy requirement turns, in part, on the parties' conflicting views concerning whether plaintiffs could have received a certificate of occupancy, had they applied for one. That is, defendants argue that had plaintiffs applied for a certificate of occupancy, one would have been freely given, as long as plaintiffs paid the $57.00 filing fee and submitted to a series of inspections. *See* Defs.' Mot. for Summ. J. at 17 ("there is not the slightest indication that the District would refuse to grant a certificate of occupancy to the plaintiffs, or would onerously condition such a grant"). It would have been, in defendants' words, a "perfunctory process." Defs.' Ex. 13 at 138–39 (Dep. of Johnson).

Plaintiffs, on the other hand, insist that, even had they applied, a certificate of occupancy would not have issued-because it could not have, given that certificates of occupancy may only issue to properties in legal use. According to plaintiffs, as a condition precedent to obtaining a certificate of occupancy, they would have had to become a valid CBRF, which would have entailed their becoming a "CRF for the mentally ill." And, as stated earlier, plaintiffs could not have become a "CRF for the mentally ill," without fundamentally altering Zeke's House's structure and purpose.

### b. Defendants' Motion for Summary Judgment

Defendants' motion for summary judgment as to this claim can be disposed of

---

18. The District of Columbia Zoning Commission has found this to be the case as well. The Zoning Commission stated, in a 1992 order, that "[w]hile the CBRF provisions of the Zoning Regulations do not explicitly treat handicapped individuals differently from others, the effect of the application of the regulations may inadvertently deny handicapped individuals in a group residential setting equal

rights when compared to non-handicapped individuals." Pls.' Ex. 2 (Zoning Commission Order 725). The Zoning Commission continued by noting that "placing greater restrictions on CBRF's, which may house handicapped persons, than are placed upon unrelated adults occupying a dwelling, could be subject to challenge under the provisions of the Fair Housing Amendments Act . . . ." *Id.*

summarily. If the facts as presented by plaintiffs are accepted, as they must be under Fed.R.Civ.P. 56, the court must find that defendants' regulations erect a bar to legal occupancy on the basis of disability, in clear violation of the FHAA.

### c. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs' motion for partial summary judgment warrants more consideration. In ruling upon plaintiffs' motion, the court must take the facts in the light most favorable to defendants, the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Thus, plaintiffs' protestations aside, the court must assume that, had plaintiffs filed for a certificate of occupancy, a certificate of occupancy would have been freely given. Given this assumption, the question is quite close. The court finds, however, that, even as described by defendants, the District's certification requirement violates the FHAA because obtaining a certificate of occupancy imposes a significant burden on the disabled, not imposed on other residents.

In analyzing this question, the court must weigh the burden imposed by the certificate of occupancy requirement, given defendants' description thereof. In so doing, the court first finds that a not-insubstantial monetary burden is imposed by the $57.00 certificate of occupancy filing fee. The court additionally finds that the inspection requirement is quite onerous.[19] Although the inspection requirement is

never clearly explained, the current Zoning Administrator's unchallenged deposition testimony indicates that, in order to obtain a certificate of occupancy, a premises must undergo a series of inspections by construction, electrical, plumbing, and fire inspectors who are empowered to order "minor renovations or installations based on the inspections." Defs.' Ex. 14 at 104–05 (Dep. of Bello).[20] The court finds that the monetary burden of the filing fee, combined with the practical burden of the inspection requirement, poses a substantial hurdle to legal occupancy.

In finding that the certificate of occupancy requirement is burdensome enough to violate the FHAA, the court also relies on a line of authority which has "consistently held that discriminatory procedural requirements are themselves violative of the FHAA." *Potomac Group Home Corp. v. Montgomery County*, 823 F.Supp. 1285, 1297 (D.Md.1993). *See United States v. Village of Palatine, Illinois*, 37 F.3d 1230, 1234 (7th Cir.1994) (Under the FHAA, "[a] procedure may not be required only of the handicapped but not of other people"). Indeed, "courts have consistently invalidated a wide range of municipal licensing, zoning and other regulatory practices affecting persons with disabilities." *Alliance of the Mentally Ill*, 923 F.Supp. at 1069 (quoting *Potomac Group Home*, 823 F.Supp. at 1294). *See, e.g., Bangerter*, 46 F.3d at 1500; *Marbrunak, Inc. v. City of Stow, Ohio*, 974 F.2d 43, 46–47 (6th Cir.1992); *United States v. Chicago Heights*, 161

---

**19.** This inspection requirement is also imposed on newly-constructed single family homes, but families are not subject to the inspection requirement when they move into homes that had an "existing single-family use." Defs.' Ex. 14 at 105 (Dep. of Bello).

**20.** The brief for the *amicus curiae* raises the interesting point that the very need to satisfy special procedures imposes a stigmatic injury on the mentally disabled, "a tangible symbol

of society's hostility to persons with mental disabilities." Brief of *Amicus Curiae* at 11; *see also Potomac Group Home Corp. v. Montgomery County*, 823 F.Supp. 1285, 1297 (D.Md.1993) (briefly discussing stigmatic injury). While this question is indeed intriguing, plaintiffs have not shown that stigmatic harm constitutes a cognizable injury that is redressable under the FHAA.

F.Supp.2d 819, 842 (N.D.Ill.2001); *Horizon House*, 804 F.Supp. at 694.[21]

In sum, for the reasons stated, the court finds that plaintiffs have made out a prima facie case of disparate treatment under the FHAA.

**2. Defendants' Application of the Zoning Regulations Subjected Plaintiffs to Disparate Treatment**

 In addition, plaintiffs argue that defendants' *application* of the Zoning Regulations subjected plaintiffs to less favorable treatment on the basis of the residents' disability. This claim is based upon plaintiffs' assertion that, although the Zoning Administrator, under the regulations, had authority to characterize Zeke's House as a family, he chose not to do so because of the residents' disability. Pls.' Ex. 7 (Zoning Commission Order 347, July 9, 1981); Pls.' Ex. 40 at 53–55 (Dep. of Bello).

In this case, plaintiffs adduce direct evidence of a discriminatory motive, and so plaintiffs' as-applied challenge is best analyzed under the disparate treatment framework. *Trans World Airlines v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination"); *Children's Alliance*, 950 F.Supp. at 1495.

 It is well settled that a defendant's decision or action constitutes disparate treatment, or intentional discrimination, when a person's disability was a "motivating factor" behind the challenged action or decision. *Tsombanidis v. City of West Haven*, 129 F.Supp.2d 136, 151 (D.Conn.2001); *Samaritan Inns v. District of Columbia*, 1995 WL 405710, * 27 (D.D.C.1995), *aff'd in part, rev'd in part*, 114 F.3d 1227 (D.C.Cir.1997). To prevail on a disparate treatment claim, a plaintiff need not demonstrate that the defendant was motivated "solely, primarily, or even predominantly" by her disability. *Tsombanidis*, 129 F.Supp.2d at 151. Nor need a plaintiff demonstrate that the defendant was motivated by an invidious or malicious desire to discriminate against persons with the protected characteristic. *Bangerter*, 46 F.3d at 1501 ("a plaintiff need not prove the malice or discriminatory animus of a defendant to make out a case of intentional discrimination"); *Samaritan Inns*, 1995 WL 405710 at * 27; *Potomac Group Home Corp.*, 823 F.Supp. at 1295. Instead, to prevail, a plaintiff need simply show that a protected characteristic played a role in the defendant's decision to treat her differently. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Tsombanidis*, 129 F.Supp.2d at 152; *McKinney Found. v. Town Plan & Zoning Comm'n*, 790

---

**21.** The court recognizes that some authority may support a different view. *See, e.g., Keys Youth Services, Inc. v. City of Olathe, Kansas*, 52 F.Supp.2d 1284, 1301 n. 18 (D.Kan.1999), *rev'd in part*, 248 F.3d 1267 (10th Cir.2001) (finding that the city did not discriminate against residents on the basis of their handicap by requiring them to go through a special permit process); *Oxford House–C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir.1996) (holding that a FHAA plaintiff must give the city an opportunity to accommodate a group home through procedure for adjusting zoning). The court finds, however, that the approach offered here is more faithful to the Supreme Court's admonition to give the FHAA a generous construction, in keeping with Congress' broad remedial intent. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995); *accord Helen L. v. DiDario*, 46 F.3d 325, 333 n. 14 (3d Cir.1995) (the FHAA constitutes a " 'clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream' ") (quoting H.R.Rep. No. 711, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179).

F.Supp. 1197, 1211 (D.Conn.1992); *A.F.A.P.S. v. A.R.P.E.*, 740 F.Supp. 95, 103 (D.Puerto Rico 1990).

Plaintiffs present the following, uncontroverted evidence, tending to show that the Zeke's House residents' disabilities played a motivating role in the Zoning Administrator's decision to characterize Zeke's House as a CBRF and, consequently, require a certificate of occupancy. First, the then-Zoning Administrator, in issuing his opinion, stated that he was classifying Zeke's House as a CBRF because the Zeke's House residents, "by nature of their condition, are in common need of assistance or rehabilitation in their daily living." Pls.' Ex. 4 at 2 (Zoning Opinion, Sept. 6, 2001). In addition, Olutoye Bello, the current Zoning Administrator who participated in the decision, stated that Zeke's House was classified as a CBRF "based on material that [plaintiffs] provided us, which basically said that these residents were formerly homeless men who suffered some kind of mental illness...." Pls.' Ex. 9 at 60–61 (Bello Dep.).

Plaintiffs further point to the sequence of events leading up to the Zoning Administrator's decision. Specifically, plaintiffs highlight the widespread and vocal neighborhood opposition to Zeke's House, contending that this opposition prompted the Zoning Administrator to render his ultimate, unfavorable decision. According to plaintiffs, this opposition provides additional, circumstantial evidence of defendants' discriminatory intent.

■ Defendants, however, challenge plaintiffs' claim that neighborhood opposition played an improper role in District decision-making. While defendants acknowledge that there was "neighborhood opposition to the home," defendants maintain that "the facts ... clearly show that any such resistance did not *unduly*[22] influence the actions of DCRA in requiring the home to apply for a certificate of occupancy." Def.'s Mot. for Summ. J. at 11 (emphasis added). In support of this claim, defendants point to former Zoning Administrator Johnson's deposition testimony, in which he stated that he met with the neighbors as well as representatives from Zeke's House, considered all the information submitted to him, and gave all complaints the same attention. Defs.' Ex. 13 at 52–55, 76–77, 88–89, 104–06 (Dep. of Johnson). Defendants further point to the deposition testimony of current Zoning Administrator Bello, who stated that, while he reviewed materials submitted by plaintiffs, he did not even review the materials submitted by the neighbors. Defs.' Ex. 14 at 18–19, 24, 27–28, 120–21 (Dep. of Bello). Defendants thus insist that "[t]he District strictly followed the certificate of occupancy regulations, and applied the same standards to Zeke's House as it applies to any other property owner." Def.'s Mot. for Summ. J. at 12.[23]

---

**22.** Defendants' use of the term "unduly" here must be noted, given that defendants' misapprehension of governing law may have affected their view of what constituted "undue influence." *See* note 23 *infra*.

**23.** Defendants proceed to argue that even if neighbors' "negative attitudes and irrational fears" caused the District to treat Zeke's House differently, the District was not guided *only* by these improper purposes. Defs.' Mot. for Summ. J. at 14; *see also* Defs.' Supp. Mot. for Summ. J. at 17. Defendants argue that,

so long as the District's motivation was at least partly legitimate, its actions cannot be found to constitute intentional discrimination. Defendants provide: "Even if the District officials who visited Zeke's House were aware of community opposition to it and inspected the site 'hoping' to find zoning violations, such facts, if proven, are insufficient alone to show discriminatory intent." *Id.* Defendants cite to *Bannum, Inc. v. City of Fort Lauderdale*, 157 F.3d 819 (11th Cir.1998), in support of their argument that a city acts improperly, in deny-

In regard to the neighborhood opposition, the law is quite clear that "even where individual members of government are found not to be biased themselves," plaintiffs may demonstrate a violation of the FHAA if they can show that "discriminatory governmental actions are taken in response to significant community bias." *Tsombanidis,* 129 F.Supp.2d at 152; accord *United States v. Borough of Audubon, New Jersey,* 797 F.Supp. 353, 361 (D.N.J.1991). Accordingly, "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 49 (2d Cir.1997); see also *Samaritan Inns,* 1995 WL 405710 at * 27 (finding a violation of the FHAA when government officials were influenced by political pressure exerted by the area residents); *McKinney,* 790 F.Supp. at 1212 (same); *Support Ministries for Persons with AIDS, Inc. v. Village of Waterford,* 808 F.Supp. 120, 134 (N.D.N.Y.1992) (finding that zoning officials violated the FHAA when they bowed to political pressure exerted by those hostile to persons with alcohol and drug-related disabilities).

Upon careful analysis, the court finds that defendants, in characterizing Zeke's House as a CBRF, were motivated, at least in part, by the disability of the Zeke's House residents and that neighborhood opposition played a role in the District's decision.

There is no question that neighbors voiced strong opposition to Zeke's House *because* it was to house disabled residents. Defs.' Reply at 2–3 (conceding this point). The neighbors expressed such views through the petition, at meetings with area officials, including the Zoning Administrator, and via numerous e-mails and letters. *See, e.g.,* Pls.' Ex. 20 (Hergenreder e-mail to Johnson, July 5, 2001) ("This is not the proper placement for a group house of mentally ill men suffering from Bipolar disease and schizophrenia.... I stand opposed to Zeke's [H]ouse in this location."); Pls.' Ex. 21 (Morris e-mail to Johnson, July 3, 2001) ("the thought of having five unsupervised, mentally ill men living within yards of our children is not a situation we are comfortable with .... We would prefer to have the group located elsewhere, but if that is not possible, we demand that the D.C. government oversee this home and ensure that there is 24–hour qualified supervision of the residents."); Pls.' Ex. 22 at 2 (Massey Ltr. to Johnson, April 10, 2001) (stating that Zeke's House residents "may have felony records, and some may have been medically diagnosed as substance abusers").

In addition, it is clear that Zoning Administrator Johnson was at least somewhat influenced by these letters and com-

---

ing homes to the disabled, only if the city's conduct is "entirely devoid of rationality" and the community opposition was the "sole reason for the city's actions." Defs.' Mot. For Summ. J. at 13–14 (citing *Bannum,* 157 F.3d at 824). Defendants' arguments, and their reliance on *Bannum,* demonstrate a fundamental misapprehension of governing law. In *Bannum,* the issue presented was whether a city ordinance violated the plaintiff's *constitutional* rights to due process and equal protection. The court, accordingly, applied the rational basis test, as provided in *Cleburne v.*

*Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and found no violation. Because the FHAA explicitly extends the FHA's protections to disabled individuals, this case is not governed by mere rationality review, as was *Bannum.* *Bannum* is thus inapposite. Under the FHAA, a plaintiff is simply not required "to prove that the challenged action rested solely on ... discriminatory purposes." *Village of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

plaints.[24] In his official Opinion regarding Zeke's House, Zoning Administrator Johnson stated: "[B]ased on the information provided by the Community Council for the Homeless at Friendship Place, *neighbors, community organizations, and ANC 3–G*, it is the opinion of the Office of the Zoning Administrator that the living arrangements planned at the above referenced property (Zeke's House) fall under the definition of Community Based Residential Facility." Pls.' Ex. 4 at 1 (Zoning Opinion, Sept. 6, 2001) (emphasis added); *see also* Pls.' Ex. 42 at 45, 83 (Dep. of Johnson) (confirming that he relied upon the "information ... submitted by the neighbors" and noting that the Zoning Administration is "reactive rather than proactive"). Additionally, the Zoning Administrator went so far as to tell the neighbors that the information and documentation they presented was necessary to the initiation and completion of the investigation of Zeke's House. Pls.' Ex. 24 (Johnson Ltr. to Jakovic, May 27, 2001) ("The Office of the Zoning Administrator will look forward to receiving the information and documentation from the community, in order to initiate the investigation of the single-family unit that allegedly will be a CBRF housing (6) unrelated tenants with special needs.").

Plaintiffs therefore have shown, by way of uncontroverted direct and circumstantial evidence, that District administrators were motivated, at least in part, by the disability of the Zeke's House residents. The court therefore must conclude that the District's decision to classify Zeke's House as a CBRF is tainted with discriminatory intent. Plaintiff' as-applied challenge makes out a prima facie case of disparate treatment under the FHAA.

### 3. "Unique and Special Needs and Abilities"

 While the court has so far found that: (1) the District's ordinance facially discriminates on the basis of disability and that (2) Zeke's House residents were subjected to disparate treatment on the basis of their disability, the court's inquiry is not yet complete. Under the FHAA, a defendant may avoid liability if she can demonstrate that the different treatment-i.e., imposition of a special restriction-is "warranted by the unique and special needs and abilities of those handicapped persons to whom the regulations apply." *Larkin v. State of Michigan Dep't of Social Services*, 89 F.3d 285, 290 (6th Cir.1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503–04 (10th Cir.1995). This exception is based upon Congress' recognition that, at times, legitimate concerns can support the imposition of extra burdens and restrictions on group homes for individuals with disabilities. The FHAA accordingly provides: "Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health and safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9).

The D.C. Circuit has not adopted a standard of review for determining when special restrictions are warranted under the FHAA, and the circuits are split. The Eighth Circuit subjects defendants' rationales in FHAA challenges concerning homes for the disabled to mere rational basis review, just as if the challenge were brought under the Equal Protection

---

24. *See* Pls.' Ex. 34 (Katz e-mail to Council Members and Johnson, Sept. 24, 2001) ("questions were raised about Zeke's House's legal status almost immediately following its purchase, *leading ultimately* to Mr. Johnson's explicitly informing CCHFP, before the facility began operating, that Zeke's House could not open without permits") (emphasis added).

Clause. *See Oxford House–C v. City of St. Louis,* 77 F.3d 249 (8th Cir.1996); *Familystyle of St. Paul v. City of St. Paul,* 923 F.2d 91, 94 (8th Cir.1991). The Sixth Circuit and Tenth Circuit, meanwhile, employ a more searching method of analysis. In the Sixth and Tenth Circuits, to rebut a finding of intentional discrimination, the defendant must show either: (1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, and is not based upon stereotypes. *Larkin,* 89 F.3d at 290; *Marbrunak, Inc. v. City of Stow, Ohio,* 974 F.2d 43, 47 (6th Cir.1992); *Bangerter,* 46 F.3d at 1503–04 (rejecting the rational basis framework because "the FHAA specifically makes the handicapped a protected class for purposes of a statutory claim-they are the direct object of the statutory protection-even if they are not a protected class for constitutional purposes").

This court finds that because disabled persons are specifically protected by the FHAA, rational basis review is not the appropriate standard for analysis. The court will therefore rely upon the Sixth and Tenth Circuit's framework, as the majority of courts to consider this question have done. *See, e.g., United States v. City of Chicago Heights,* 161 F.Supp.2d 819, 843 (N.D.Ill.2001); *Children's Alliance v. City of Bellevue,* 950 F.Supp. 1491, 1497–98 (W.D.Wa.1997); *Alliance for the Mentally Ill,* 923 F.Supp. at 1074–75. The court now stands ready to evaluate defendants' proffered explanation for their certificate of occupancy requirement.

Defendants defend the certificate of occupancy requirement on the ground that certificates inform the government of the proposed uses of property, thereby ensuring compliance with zoning regulations. Defs.' Opp. at 10 (citing *Savage v. District of Columbia,* 54 A.2d 562 (D.C.Mun.App. 1947)).

Defendants' justification does not satisfy § 3604(f)(9); it neither explains the different treatment afforded CBRF's, as opposed to "families," nor responds to specific and legitimate safety concerns, nor benefits the disabled residents of Zeke's House. Moreover, the court finds that alternative schemes that do not burden persons based upon their "common need for treatment, rehabilitation, assistance, or supervision in their daily living" would serve the District's valid interest in obtaining information "with less discriminatory effect." *Bangerter,* 46 F.3d at 1504 (quotation omitted). Defendants' proffered rationale, quite simply, does not explain why the District needs more information from those in need of "treatment, rehabilitation, assistance, or supervision," than it does from others. *See generally City of Chicago Heights,* 161 F.Supp.2d at 844 (reaching a similar conclusion).

## III. CONCLUSION

In sum, the court concludes that, without adequate justification, the District of Columbia's zoning regulations treat five persons with mental disabilities less favorably than five similarly-situated persons without such disabilities, and, in so doing, discriminate against such persons in the terms, conditions, and privileges of the sale and rental of single-family dwellings, in violation of §§ 3604(f)(1), (2). The court further finds that, in this case, the Zoning Administrator, in the exercise of his discretion, imposed a burden on Zeke's House's disabled residents, because of their disability, also in violation of the FHAA.

Accordingly, it is this ____ day of April, 2003,

**ORDERED** that defendants' motion for judgment on the pleadings or, in the alter-

**230**

native, for summary judgment must be **GRANTED** as to defendants' claim that the District of Columbia Department of Consumer and Regulatory Affairs, the District of Columbia Office of the Chief Financial Officer, and the District of Columbia Office of Tax and Revenue are *non sui juris*, and **DENIED** as to defendants' other claims; and it is further

**ORDERED** that defendants' supplemental motion for summary judgment is likewise **DENIED**; and it is further

**ORDERED** that plaintiffs' cross-motion for summary judgment as to liability only is hereby **GRANTED** as against defendant Olutoye Bello, sued in his official capacity.

### ORDER

Before the court is the motion of the Judge David L. Bazelon Center for Mental Health Law, the National Law Center for Homelessness and Poverty, the American Association of People with Disabilities, the Washington Legal Clinic for the Homeless, the National Association of Protection and Advocacy Systems, the Whitman–Walker Clinic, and University Legal Services, for leave to file a brief as *amici curiae* in support of plaintiffs. There being no opposition to this motion, the court concludes that the motion should be granted.

Accordingly, it is, this 16th day of April 2003, hereby

**ORDERED** that the motion to file a brief as *amici curiae* is **GRANTED**. The court will consider the brief in its entirety.